EDNA HALL BARNES *v.* GEORGE C. BARNES

[No. 144, September Term, 1971.]

*Decided March 8, 1972.*

The cause was argued before ANDERSON, MOYLAN and GILBERT, JJ.

*Robert Paul Mann* for appellant.

*William F. McDonald,* with whom was *Robert P. Conrad* on the brief, for appellee.

ANDERSON, J., delivered the opinion of the Court.

Edna Hall Barnes, appellant (hereinafter called the wife), appeals from a decree of Circuit Court No. 2 of Baltimore City, dated January 27, 1971, dismissing her cross-bill of complaint, in which she prayed for a divorce *a vinculo matrimonii* from her husband, George C. Barnes, appellee (hereinafter called the husband) on the grounds of adultery and granting to her husband a divorce *a mensa et thoro* on the grounds of desertion.

The facts reveal that the parties were married on December 6, 1946, and lived together at 3016 6th Avenue, in Parkville, Baltimore County, Maryland, until May 18, 1970, when the wife left the home of the parties and moved to the Colmar Apartments, in Baltimore City, where she presently resides. No children were born of the marriage, although the wife has a daughter by a prior marriage. At the time of the marriage, the husband was employed at the Martin-Marietta Company, while the wife was a beauty shop operator, operating a beauty shop at 1327 East North Avenue owned by the parties. They had resided at 3016 6th Avenue in Parkville for some 12 or 13 years prior to the date of the separation, and the house was jointly owned. Because of the nature of the wife's employment, she frequently worked late, and, as a result, the husband did most of the cooking and housework. The marriage appeared reasonably happy until around 1964, when the wife left the

marital bedroom and moved into a separate bedroom. The only apparent reason for so doing was that her husband liked to sleep with the windows opened and it bothered the wife's sinus. After that date they practically ceased living together as husband and wife and each went their separate ways.

On October 2, 1968, the wife went to work for the Maryland General Hospital as a clerk-typist and was soon a communication co-ordinator. She had closed the beauty shop after the city riots, which had caused her business to deteriorate to such an extent that she could no longer carry it. At the time the suit was heard, she was on a temporary leave of absence from her work at the hospital. Prior to 1968, the wife had put a lock on her bedroom door to keep her husband out, and had suggested to him that he go out and get himself a girl friend. Each was living independent of the other except for one occasion, about a year prior to her leaving, when they had sexual relations after she came to his bedroom. Around that time he started dressing up and going to Saturday night dances at the V.F.W. Post of the American Legion in Parkville. It was there that the husband met the alleged correspondent, Lola Keefer. In October 1968, the wife became suspicious of where her husband was going and retained the Captain Emerson Detective Agency to make a surveillance of her husband. The investigation began on October 25, 1968, and lasted until May 9, 1970. During the 18 month period there were only four occasions when the husband was observed at the home of and in the company of Lola Keefer. On May 18, 1970, while the husband was at work, the wife left the home at 3016 6th Avenue, in Parkville, Baltimore County, and moved to the Colmar Apartments, in Baltimore City. When she left she took all the furniture with her. In addition, without her husband's knowledge, she had previously withdrawn $8,000.00 from a joint account in the Calvert Building and Loan Association, taking the passbook with her. This sum had all been deposited out of the husband's pay checks. In addition, she took certain

jointly held stocks. After the wife left the home, the husband filed suit for a divorce *a mensa et thoro* on the grounds of desertion and for a division of the personal property. The wife filed an answer to the bill of complaint denying the desertion, and filed a cross-bill of complaint against the husband praying for a divorce *a vinculo matrimonii* on the grounds of adultery together with alimony and counsel fees.

I

It was agreed between the parties that the wife and cross-plaintiff would first proceed with her testimony relating to the husband's adultery. Frank Fair, an agent for the Emerson Detective Agency, testified that the surveillance of the husband began on October 25, 1968, and continued through May 9, 1970. On May 9, 1970, he, together with another agent, parked across from the V.F.W. Post 137 on Putty Hill and Old Harford Roads, in Baltimore County, at approximately 8:00 p.m. At approximately 9:15 p.m., he observed George Barnes and a woman, identified as Lola Keefer, park in the parking lot and enter the hall where a dance was in progress. They had a table in the rear and danced almost every dance. The witness testified that he observed them hugging and kissing. They left the dance and drove directly to Miss Keefer's home at 2904 Taylor Avenue, in Parkville, arriving at 12:45 a.m. Miss Keefer left the car and entered the house and Mr. Barnes drove directly home, arriving at 12:50 a.m.

On May 2, 1970, at 7:15 p.m., he and another agent parked across from 2904 Taylor Avenue. There was a dim light on in the rear of the house, and, at 8:15 p.m., Miss Keefer came out and emptied some trash. At 9:15 p.m., Mr. Barnes came out and drove off, but returned and picked up Miss Keefer who was waiting. They then drove to the V.F.W. Post 137 and entered the hall. At 11:00 p.m. surveillance ended.

On April 25, 1970, he and another agent parked across from 2904 Taylor Avenue, and, at 8:55 p.m., they ob-

served Mr. Barnes and Miss Keefer come from the house and enter his car and drive away. They did not attempt to follow but went to the house and knocked but no one answered. Mr. Barnes and Miss Keefer returned at 1:10 a.m., parked and entered the house. There was a dim light on inside. At 3:05 a.m. Mr. Barnes left the house and went directly home, arriving at 3:15 a.m.

On April 20, 1970, surveillance began around noon, when Mr. Barnes and Miss Keefer were observed in a used car lot on Eastern Boulevard. At 12:50 p.m. they drove to the Forrest Auto Park, where Mr. Barnes purchased a windshield. At 2:45 p.m. they drove to Miss Keefer's house, where Mr. Barnes started working on an old Pontiac in the yard. Miss Keefer came out at 3:35 p.m. and drove to the J. & J. Auto Supply on Harford Road and returned at 4:25 p.m. At 4:40 p.m. both drove to Volvo Auto Parts and returned at 6:50 p.m. At 8:35 p.m. Mr. Barnes left and returned with groceries. A dim light was on in the front part of the house. At 1:00 a.m. Barnes left and drove directly home.

Mrs. Barnes testified that on May 2, 1970, she stopped by Miss Keefer's house. Both Mr. Barnes and Miss Keefer were in the yard where Mr. Barnes was working on an old Pontiac automobile. She had a 45 minute conversation with her husband. When she left, she asked him if he was coming home for lunch and he said he was not. She further testified that since 1968 her husband had been dressing up and going out on Saturday nights, coming in late. She testified that she had received the report from the Emerson Detective Agency, and had paid them $1400.00 for their 18 month surveillance of Mr. Barnes. She also testified that on two occasions a woman called her on the telephone. The first time she said she was Lola and asked to speak to George. When she told her he was not there, she said to tell him Lola called. Also one night a woman called while her husband was out and they had quite a lengthy conversation during which she (Mrs. Barnes) told her the "little problem she had against her husband as to their incompatibility." She said that the

woman refused to give her name but she knew it was the same woman who had called previously as she knew her voice. On cross-examination she admitted that she left the home on May 18, 1970, taking all the furniture with her. She stated on direct examination that the reason she left was that she was in fear of her life. This was because many things had happened to her car so that she kept it away from the house, and had someone stay with her, a Mrs. Teeter (who did not testify). She testified that her husband was presently living in the house alone, and that she had a new automobile, a 1970 LeMans Pontiac, which she had purchased with the money taken from the savings account. She testified that she had never forgiven or condoned her husband's conduct, as reported to her by the detective agency, and there was no possibility of a reconciliation. She further testified that after she had withdrawn the money from the joint savings account (it was deposited from her husband's pay checks), she used some of the money to take a vacation to Bermuda, bought clothes for herself, bought an automobile, paid the detective agency, paid her lawyer a retainer, and paid her moving costs, including furnishing her new apartment. She further testified that the money had been withdrawn about 2½ years previously. No evidence was ever produced to show that her husband had been unkind to her or ever physically abused her. The cross-plaintiff then closed her case.

The cross-defendant then offered two witnesses, Mrs. Amber Fuller and Russell Scoggins. Mrs. Fuller, a close friend of Mrs. Barnes, testified that Mrs. Barnes told her that she had moved from her husband's bedroom and now had a room to herself, and that she wished her husband would get himself someone else and leave her alone. Mr. Scoggins testified that he was a next door neighbor to Mr. and Mrs. Barnes and had been so for 12 years; that he was friendly with both and that he thought it was a good marriage. He testified that Mrs. Barnes would leave around 8:30 a.m. in the morning and return between 8:30, 10:00 or 11:00 p.m. at night. He further

644

testified that Mr. Barnes never complained and that, from what he observed, he (Mr. Barnes) did most of the cooking; that Mr. Barnes was home a great deal and did a lot of work in the home and was constantly doing things in the home; and that, to his knowledge, he never gave his wife any reason to leave him on May 18, 1970.

Lola Keefer testified that she lived at 2904 Taylor Avenue in Parkville and first went out with Mr. Barnes in April, 1969. She stated that they had regular Saturday night dances at the American Legion Post 137 in Parkville and that she had gone to dances there with Mr. Barnes. She denied that she had ever committed adultery with Mr. Barnes, and stated that she was single and a virgin. When asked if she would be willing to submit to a lie detector test she stated, "I certainly would. I would be more than glad to." This was refused by Mrs. Barnes' attorney. On cross-examination she admitted that she lived alone and that she had not gone out with any other man than Mr. Barnes since January 1, 1970. She denied that George Barnes was anything other than a good friend. She admitted that he had kissed her, but denied that they had ever kissed or hugged each other at a dance, as testified to by the detective. She testified that she had never been in her house alone with Mr. Barnes when there was not a light on in the house and it was not a dim light. In response to a question by the court as to what did they do in the house, she answered that they talked a great deal, a lot of it in discussing his problems, of which he had many. They played records, listened to the radio, prepared food and had eaten and had washed dishes. In answer to a further question from the court, she stated that she recalled the occasion, on May 2, 1970, when Mrs. Barnes stopped by her house. Mrs. Barnes told her that she knew she was going around with her husband and accused her of being upstairs having sexual relations with him. She stated that this was absolutely not true. She had never had sexual relations with him or with any other man, any other place, any other time.

Asked her age, she said she was 46 years old. She denied ever having telephoned Mrs. Barnes at any time.

George C. Barnes, the cross-defendant, testified that he lived at 3016 6th Avenue, in Parkville, Baltimore County, and was the husband of Edna Hall Barnes. He stated in the past six years his wife would hardly speak to him. He was at home by himself the majority of time. Many evenings, when he was home watching television, she would come in and not speak but go right to bed. He stated that she had moved out of the bedroom in 1964, and there was a long period of time when they had no sexual relations, and that she told him to go out and get himself a girl friend. He liked to work around the house and added a utility room, kept the lawn, did the painting and had made many repairs. He stated that he loved to dance and he and his wife had gone dancing occasionally, but after a while she refused to go to dances with him, so he started going to different clubs dancing and that is when he met Lola Keefer. He denied absolutely that he had ever committed adultery with Lola Keefer, but admitted going to her home and going out to dances with her. He stated that the account of $8400.00 in the Calvert Building and Loan Association was his money, but that he had the account placed in the joint names of his wife and himself, as was all other property. His wife had inherited $3300.00, which she put in her own name in the Union Trust Company. He said that he had wanted to sell the North Avenue property for $25,000.00, which they had been offered, but his wife refused, and after the riots it had little value. However, he was paying the taxes and ground rent on the property. The 6th Street property, where they lived, was in their joint names and when his wife left she took everything with her. He stated that he had done all the cooking since they were married and his wife seldom came home for dinner. He had never opened a bank account in his own name until after his wife left and he found she had withdrawn all the money from the savings account. He said he liked Miss Keefer as a friend but only as a friend. For the

past nine months he had been working the night shift—
4:00 p.m. to 12:30 a.m., Monday through Friday.

In a comprehensive oral opinion the lower court found
that the evidence submitted on behalf of the cross-plain-
tiff, Edna Hall Barnes, was insufficient to prove that the
cross-defendant, George Barnes, was guilty of adultery
with Lola Keefer and it, therefore, dismissed the cross-
bill of complaint and granted the plaintiff, George C.
Barnes, a divorce *a mensa et thoro* from the original de-
fendant, Edna Hall Barnes. The trial judge found, as a
fact, that several years prior to her leaving, Mrs. Barnes
had told her husband that he should go out and get his
own date, somewhere else, and that they had started liv-
ing apart in the same house. He further found that in
1968 Mrs. Barnes suspected her husband was having
dates with other women and employed a detective agency
to watch him. Although the agency worked on the case
from October 25, 1968, to May 9, 1970, on only two
occasions during the numerous times they had Mr.
Barnes under surveillance did they find any evidence or
suggestion that he had committed adultery with Lola
Keefer, and these occasions were on April 20th and April
25th, when he spent several hours with her at her house
on Taylor Avenue late in the evening. Both Mr. Barnes
and Miss Keefer admitted it, but each of them emphat-
ically, and without hesitation, denied having committed
any act of adultery. The lower court found on these two
occasions they had the opportunity and the disposition
or, as it is sometimes called, the inclination to commit
adultery. Although the lower court found both the op-
portunity and the disposition, it refused to believe that
they committed the act of adultery. In arriving at this
conclusion the trial judge stated: "The one thing I do
know, however, is what is in my mind, and what is in
my mind is a very, very, very strong doubt as to whether
Mr. Barnes and Miss Keefer actually committed adultery,
although they certainly had the opportunity, and I be-
lieve they had the inclination. Neither will admit being
in love with the other. There is a certain kind of affec-

tion between them, to be sure, but there is a doubt in my mind. It is not the kind of doubt you would have in a criminal case. *It goes beyond that.* [Emphasis added] I honestly do not believe that at this moment they committed the act of adultery, and unless I am satisfied by the greater weight of the evidence that they did, I have no alternative but to conclude that they did not, strange as it may seem."

Under the facts of this particular case we cannot say that the chancellor was clearly erroneous in arriving at this conclusion. In *Abare v. Abare,* 221 Md. 445 at p. 450, Brune, C. J., stated: "* * * To prove adultery, the circumstantial evidence must clearly establish (1) a disposition on the part of the defendant and the paramour to commit adultery, and (2) an opportunity to commit the offense. After considering these and all other facts and circumstances in the case, the court then determines *whether the evidence would convince an unprejudiced and cautious person of the guilt of the defendant.*" [Emphasis added] See *Cullotta v. Cullotta,* 193 Md. 374; *Laccetti v. Laccetti,* 245 Md. 97.

This case is another of those in which the atmosphere of the trial, the appearance and demeanor of the witnesses is invaluable in reaching a correct and just conclusion. We point out that at no time was Mr. Barnes in Miss Keefer's house when there was not a light on in the house, nor was there any evidence that he ever spent the night there.

We cannot say that the chancellor was clearly erroneous in dismissing Mrs. Barnes' cross-bill of complaint. Md. Rule 1086. On the contrary, there was ample evidence to find the original defendant, Edna Hall Barnes, guilty of desertion and that a divorce *a mensa et thoro* was properly granted to the original plaintiff, George C. Barnes.

> *Judgment affirmed; appellee to pay the costs; and case remanded to determine the question of property rights and attorneys' fees.*