## HELEN COLLEEN DECKMAN *v.* WILLIAM RAY DECKMAN

[No. 551, September Term, 1971.]

*Decided June 30, 1972.*

554

The cause was argued before MURPHY, C. J., and MORTON and CARTER, JJ.

William W. Grant for appellant.

No brief or appearance for appellee.

CARTER, J., delivered the opinion of the Court.

On June 15, 1971, Helen Colleen Deckman (appellant) filed a bill of complaint against her husband William Ray Deckman (appellee) praying a divorce a mensa, temporary and permanent alimony, custody of their two minor children, and counsel fees. The ground alleged in the bill was constructive desertion. The husband answered the bill denying the material allegations and filed a cross-bill seeking a divorce a vinculo and custody of the children on the ground of the wife's alleged adultery. The wife answered the cross-bill, as supplemented, denying the allegations. After hearing, the chancellor passed a decree dismissing the wife's original bill [1] and granting the hus-

---

1. The chancellor set forth in his signed opinion that the original bill of the appellant "will be dismissed for a total lack of evidence substantiating the allegations therein." However, the decree attached to the opinion makes no mention of the original bill. Nevertheless, as it is patent from the signed opinion that it was the chancellor's intention to dismiss the bill and the appellant in her brief treated the trial court's action as amounting to a dismissal, we shall so treat it for the purpose of this appeal.

band a divorce a vinculo and custody of the children. The wife was given reasonable visitation rights provided that when she was visiting with the children, "she was not to be in the company of her boyfriend Randy or any other boyfriends." She appealed from the decree of the Circuit Court for Garrett County.

The evidence showed the parties were married in 1964 and separated June 2, 1971. Two children were born as a result of the marriage, ages 4 years and 20 months. The appellee's employment required him to be away from home five days a week for five of the seven years of the marriage. Following the birth of their first child in 1967, the parties agreed to separate but subsequently reconciled. During Memorial Day weekend 1971, the appellant was hospitalized for several days as a result of an automobile accident. While she was in the hospital, the parties agreed to separate in accordance with their previous discussions.[2] When she was released on June 2, 1971, she found that the appellee had taken the children to his mother's home and had locked her out of their home. However, she was able to promptly obtain custody and eventually, the court ordered the appellee to permit her and the children to return to the marital domicile and required him to remain away from the home and support the children.[3]

The parties owned their home valued at about $15,000 as tenants by the entireties. They also had a joint savings account in the amount of $2300 which the husband withdrew at the time of the separation. He also failed

2. The appellant testified, "Well, I got out of the hospital, and my husband and I had already agreed to split while I was in the hospital."
3. The record shows that at the time the original bill was filed, the court passed a show cause order in respect to alimony and child support and that a hearing was subsequently held on this order. There is no evidence in the record to show the results of that hearing. However, counsel for the appellant set forth in his brief that the appellee was then ordered to pay the appellant $60 per week for the support of the two children, pending a final decree and the wife testified that the order required the appellee to allow her to remain in the home with the children without his presence.

to deposit in this account a tax refund check in the amount of $1500 payable to both parties which the wife had endorsed for deposit in the account. The appellee's annual income was approximately $14,000 from his employment as a boilermaker and appellant's annual income was about $4000 from part-time employment as a beautician.

During the three days a week that the appellant worked, a babysitter would pick up the children about 8 a.m., take them to her home, and return them to the appellant's home when she came from work about 5:30 p.m. On the two evenings a week when the appellant attended the local Community College, a babysitter stayed at the home from about 6 p.m. until 9:30 p.m. when she returned.

In respect to the appellant's alleged adultery, her testimony showed that in July 1971, she became acquainted with a twenty year old student named Randy. They became friends, he frequently visited in her home, and they occasionally went places together. She had borrowed his pick-up truck for two or three weeks in July and August 1971 when she was without a car. Immediately prior to the divorce hearing, he had taken her and her children to a little league football game.[4]

The testimony of the husband showed that he first learned of the appellant's association with Randy when he had noticed a truck frequently parked in front of her residence. Late one evening he decided to investigate, went on the back porch and looked through an open window. He saw his wife and a young blond-haired boy lying together on the living room floor. His wife had assisted the boy, who appeared to be quite drunk, in getting up from the floor. The boy then went out into the hallway and up the stairs. At that time two other adults (the "Browning boy" and Sandra Willey) were also present in the house. The "Browning boy" left soon after the blond-haired boy had gone upstairs. Sandra Willey then

---

4. Randy did not testify.

appeared in the living room with the appellant where they conversed for a few minutes and then turned out all the lights in the house. After this incident he saw the blond-haired young man (later identified as Randy) at the appellant's residence on occasions when he would go there to pick up the children.

The testimony of Mr. Ollie Graff showed that in July 1971 he had conducted a surveillance of the activities of the appellant from a location across the street from her home. On Saturday evening July 24 at 8:48 p.m., he saw a pick-up truck with a Wyoming license plate park in front of the appellant's residence. A young man with blond hair alighted from it and entered the house. At 10:03 p.m. the same young man and the appellant exited and drove away in the truck. About ten minutes later a young lady (not the appellant) came out of the residence and walked away. At 10:35 p.m. Mr. Graff left his observation post and returned at 11:55 p.m. At 2:45 a.m. July 25, the truck returned, the appellant and the blond young man alighted, and entered the house. At 2:48 a.m. a young lady (not the appellant) walked away from the residence. At 2:49 a.m. the front porch light went out and at 3 a.m. all lights went out in the house. Mr. Graff left the location at 4 a.m. and returned at 7:51 a.m. and again at 11:09 a.m. The truck was still parked in front of the residence at 11:09 a.m. July 25. On the evening of July 28, he again took up his observation post. The same pick-up truck arrived and parked in front of the residence at 8:20 p.m. and the same blond young man alighted and went into the house. At 8:56 p.m. another car arrived carrying a young couple who entered the house. At 12:30 a.m. the same young couple exited and drove away. At 12:53 a.m. all lights went out in the house and the truck remained parked in front of it. On July 31 Mr. Graff arrived at his observation post at about 9:00 p.m. and found the same truck parked in front of the appellant's residence. At 9:20 p.m. a lady (not the appellant) entered the residence and departed at 11:45 p.m. At about 12 midnight all lights went out in the

house. At that time the truck was still parked in front of the house. Mr. Graff was unable to observe what went cu inside the house or who was present at any particular time and could not see the back door.

The appellee's 51 year old mother testified that if custody of the children were awarded to the appellee, she would cease her employment at a local hospital and devote full time to caring for the children. She further stated she had cared for them on several occasions and had gotten along well with them.[5]

The two young women who acted as babysitters for the children testified that the children were well cared for by the wife and presented no unusual problems. Three acquaintances of the parties who had known them socially for more than two years and had visited in their home prior to the separation testified that the children were well cared for and happy. They further stated that the home was clean and well kept.

# I

The appellant's first contention is that the chancellor committed clear error in failing to grant her a divorce a mensa under her original bill of complaint. The bill alleges that on June 2, 1971 the appellant "had to flee with her children from the marital domicile and seek shelter with friends and relatives because she feared for her safety and that of her children" on account of the threats, harassment and abuse of the appellee. In her brief she contends that she was actually *abandoned* by the appellee on June 2, 1971 because he had locked her out of their home and denied her support without justification. However, inasmuch as the bill alleges facts that constitute constructive desertion, the appellant's relief thereunder, if any, must be determined on this ground. See *Matthews v. Kernewood, Inc.*, 184 Md. 297, 306; *Parker v. Morgan*, 170 Md. 7, 25.

It is well settled that any misconduct of one spouse

---

5. There was no evidence concerning the type of home maintained by the appellee's mother nor who composed the household.

which makes it impossible for the other to continue to live with the erring spouse without loss of his or her health, or self respect or gives reasonable apprehension of bodily injury will justify the innocent spouse in leaving the other on the grounds of "constructive desertion." See *Scheinin v. Scheinin,* 200 Md. 282, 290; *Murphy v. Murphy,* 248 Md. 455, 460; *Ballan v. Ballan,* 251 Md. 737, 740-743. However, in the instant case there is no evidence whatever to establish that prior to the separation, the appellee had been guilty of misconduct which caused the appellant to *flee* the marital abode to protect her own safety or that of her children. On the contrary, the appellant's own testimony showed that the separation was *voluntary* in that immediately prior thereto she and the appellee had mutually agreed to separate. We therefore conclude that the chancellor was not clearly in error in finding that the evidence failed to establish the grounds for an a mensa divorce as alleged in the appellant's bill (constructive desertion) and in dismissing her bill for that reason.

## II

The second contention is that the chancellor was clearly in error in granting the appellee a divorce a vinculo on the ground of the appellant's alleged adultery. In *Matakieff v. Matakieff,* 246 Md. 23 (1967), the Court of Appeals stated at 30-31:

> "The elements required for circumstantial evidence to sustain proof of adultery have often been stated by this Court. In *Dougherty v. Dougherty,* 187 Md. 21, 48 A. 2d 451 (1946), Judge Delaplaine speaking for the Court, said at pp. 27-8:
>
>> 'To prove adultery, the circumstantial evidence must clearly establish (1) a disposition on the part of the defendant and the paramour to commit adultery, and (2) an opportunity to commit the offense. After considering these and all other facts and circum-

stances in the case, the court then determines whether the evidence would convince an unprejudiced and cautious person of the guilt of the defendant.' * * *"

See also *Stenger v. Stenger,* 14 Md. App. 232, 243-244.

In holding that the circumstances surrounding the association of an alleged adulteress and her paramour need not necessarily consist of a public display of intimacy or indifference to impropriety observed by others in order to support a rational inference of an adulterous disposition, the Court of Appeals in *Abare v. Abare,* 221 Md. 445 (1960) said at 450-451:

"* * * It is true that in a number of cases in which such a disposition [adulterous] has been found, the evidence relied upon to support it has been some more or less public display of intimacy observed by others.[6] *That, however, is not essential as a matter of proof.* Nor is the statement in *Sterling v. Sterling,* 177 Md. 683, 9 A. 2d 214, to the effect that more than mere opportunity must be shown to sustain the charge, controlling here to establish the insufficiency of the evidence. We think that the evidence, if believed, does show *more than mere opportunity.* The repeated visits of the corespondent to the husband's home *show abundant opportunity,* and we think the circumstances of those visits are sufficient to warrant an inference of a disposition to commit adultery. These evening visits were fairly numerous, no one else was present, blinds and draperies were usually closed not only in the room used for television but also in the front room, the visits lasted far into the night (on one occasion at least until four o'clock the next morning), and on some Sunday mornings following Saturday evening

---

6. See *Patzschke v. Patzschke,* 249 Md. 53, 60; *Hockman v. Hockman,* 187 Md. 340, 347.

visits the corespondent would be present at an early hour to help prepare breakfast, though it was a 30-45 minute trip each way between her apartment and the husband's house. She apparently had no car of her own and her testimony is that she would call a cab to take her home after one of their evenings spent in watching television.

These facts seem to us sufficient to support an inference of a disposition on the part of both the husband and the corespondent to commit the offense charged, as well as to show ample opportunity to commit it. * * *" (emphasis supplied)

In *Pontorno v. Pontorno*, 257 Md. 576 (1970), the Court said at 579-580:

"* * * The evidence in the present case was very similar to that in *Abare* [supra] * * *.

\* \* \*

"In the instant case, the visit by Green to the wife's home, which was observed by the private detectives, lasted until the early hours of the morning. Indeed, there was evidence from which one could reasonably conclude that his visits had on occasion lasted the entire night. The total effect of the evidence is to present on the part of the wife and the paramour a callous indifference as to what the neighbors may have thought of their relationship or what justifiable conclusions they may have drawn as to the morality of their conduct by virtue of Green's round the clock arrivals and departures at the wife's apartment. We think such bland disregard for public impression about a matter which gives rise to a presumption that an illicit relationship persists is such conduct as would support an adulterous disposition. *Abare, supra* at 451, 452, and *Dougherty, supra,* at 187 [27-28]."

The chancellor in his opinion in the instant case reviewed the testimony of the appellee concerning the activities inside his home as viewed by him late one evening and in particular the conduct of Randy and the wife on that occasion. He also reviewed the observations of Mr. Graff during his surveillance of the wife's residence during three evenings and early mornings in July 1971 as testified to by Mr. Graff. He also mentioned the public appearance of the wife and children in the company of Randy at an athletic contest. From this circumstantial evidence together with the total evidence, he found that the adultery of the appellant had been clearly established.

Applying the rationale of *Abare, supra* and *Pontorno, supra* to the circumstantial evidence above mentioned, we hold that it was legally sufficient to justify the chancellor in finding as facts (1) an adulterous disposition on the part of the appellant and Randy, and (2) numerous opportunities for them to have committed the offense. We also conclude that these facts when considered together with all other evidence in the case, including the age of the appellant (28) and Randy (20) and the fact that the appellant was living separate and apart from her husband (age 33) at the time, were legally sufficient "to convince an unprejudiced and cautious person" that the appellant was guilty of the alleged offense. See *Matakieff, supra* and *Barnes v. Barnes,* 14 Md. App. 638. We therefore hold that the chancellor was not clearly in error in finding the appellant guilty of adultery and granting the appellee a divorce a vinculo matrimonii on that ground.

### III

The appellants' third contention is that the chancellor committed clear error in awarding the custody of the two children to the appellee. In his opinion the chancellor acknowledged the well-settled rule that children of tender years should not be removed from their mother except where the evidence shows she is unfit and removal is clearly required in their best interests. However, in

this case he found that the mother was guilty of adultery, that it was of a continuing nature, and that she was frequently associating with her paramour in her home and in the presence of the children. He therefore held that the best interests of the children required their removal from the mother's custody. However, the record shows that four days prior to the filing of the opinion and decree on October 28, 1971, the appellant fled the jurisdiction of the trial court (Garrett County) taking her children with her and declared that she may not return.[7] Furthermore, there is no evidence to show the whereabouts of the wife or children nor the status of the wife's relationship with or proximity to her paramour at the time the opinion and decree was filed nor at the present time. Neither was there any evidence adduced to show the appropriateness of the grandmother (appellee's mother) as custodian for these young children other than her own testimony. In view of the uncertainty of these material considerations and in the exercise of our independent judgment as to what is best for the welfare, interest and benefit of these young children (See *Sullivan v. Auslaender*, 12 Md. App. 1, 3, 5), we shall remand that portion of the decree dealing with the custody of the children without reversal or affirmance for a plenary hearing by the lower court. (Md. Rule 1071 a.) At the

---

7. The opinion and decree was filed on October 28, 1971. On November 2, 1971 the appellee (husband) filed a petition to enforce the provisions of the decree which awarded him custody of the children. The petition, supported by the appellee's affidavit, alleged that oh or about October 24, 1971 the appellant fled from her normal place of residence in Oakland, Maryland, with the children and had declared that she might not return. The petition further alleged that *the petitioner believed* that the children were in Prince George's County, Maryland with the appellant and her paramour Randy and were staying with relatives of the appellant. However, he alleged no factual basis for this belief. The appellee prayed that the custody of the children be delivered to him by any person in whose custody they may be found and that the sheriff of any county in Maryland where the children may be found be directed to seize them for the purpose of delivering them to him. On November 2, 1971 the chancellor passed an order directing that the children be delivered to the appellee by anyone having custody of them and that the sheriff of any county in Maryland where the children might be found lend his assistance in accomplishing their delivery to the appellee.

hearing the chancellor should cause such testimony and other evidence to be adduced as will fully develop the character, disposition, and general adaptability toward young children of any proposed custodian as well as the living conditions and environment of the home in which these children will reside. This evidence should also include such investigations and reports of qualified social agencies as the chancellor deems appropriate. Since the record indicates that prior to her adulterous affair with Randy the wife was a good mother to these young children, the chancellor should cause evidence to be produced relating to whether she has now discontinued her adulterous behavior and would most likely desist from such conduct in the future so that if she were given custody the children would have a good moral environment and proper home life.

For the guidance of the chancellor in making his determinations as to what custody arrangements will be best for the welfare, interests and benefit of these children of tender years (Md. Rule 1085), we point out the following holdings by the Courts of this State in respect to child custody. In *Hild v. Hild*, 221 Md. 349, the Court of Appeals said at 357:

> "For the purpose of ascertaining what is likely to be in the best interests and welfare of a child a court may properly consider, among other things, the fitness of the persons seeking custody, the adaptability of the prospective custodian to the task, the age, sex and health of the child, the physical, spiritual and moral well-being of the child, the environment and surroundings in which the child will be reared, the influences likely to be exerted on the child, and, if he or she is old enough to make a rational choice, the preference of the child. 2 Nelson, *Divorce and Annulment*, § 15.01 (2d ed., 1945). It stands to reason that the fitness of a person to have custody is of vital importance. The paramount

consideration, however, is the general overall well-being of the child.

Since the mother is the natural custodian of the young and immature, custody is ordinarily awarded to her, at least temporarily, in legal contests between parents when other things are equal, even when the father is without fault, provided the mother is a fit and proper person to have custody. * * *"

See also *Parker v. Parker,* 222 Md. 69, 75; *Sellman v. Sellman,* 236 Md. 1, 6.

In speaking of the rule concerning the eligibility of an adulterous mother to be awarded custody of a child of tender years, this Court in *Widdoes v. Widdoes,* 12 Md. App. 225, 235 (1971) quoted from *Palmer v. Palmer,* 238 Md. 327, 331 as follows:

"* * * 'If the mother is shown to be an adulteress, a strong presumption arises that she is not a fit and proper person to have custody. * * *

The rule is not absolute. When the adulterous relationship has ceased and appears unlikely to be revived because the mother has changed her way of living, her past indiscretions may be overlooked and she may be given the custody of a minor child. * * * However, the past decisions of this Court require a strong showing to be made to overcome the usual rule against awarding custody to an adulterous mother. * * *' "

In commenting on the rule enunciated in *Palmer, supra,* we further said in *Widdoes, supra* at 236:

"* * * We find no real departure in the opinions of the Court of Appeals after *Palmer* from the necessity that a 'strong' or 'clear showing' be made to overcome the usual rule against awarding custody to an adulterous mother and

that such a showing cannot be made unless the adulterous relationship has ceased and appears unlikely to be revived * * *."

For authorities approving the award of custody of a child of tender years to a mother who has committed adultery where the relationship had ceased and appeared unlikely to be revived, see *Breault v. Breault,* 250 Md. 173, 180 (1968) ; *Kauten v. Kauten,* 257 Md. 10 (1970). Cf. *Mullinix v. Mullinix,* 12 Md. App. 402 (1971) where this Court approved an award to an adulterous mother where the chancellor made it a condition of the award that the mother cease completely her association with her paramour and the evidence showed that prior to her adultery she had been a good mother.

The record is silent as to whether the chancellor passed an order on July 12, 1971 requiring the appellee to contribute $60 a week to the support of the two children of the parties pending a final determination of custody. The appellant in her brief sets forth that such an order was passed. The appellee filed no brief in this Court and did not appear at the argument on appeal. Again for the guidance of the chancellor upon his reconsideration of the custody award if this amount ($60 per week) was fixed by him as appropriate for the support of the two children, we hold that he was not clearly in error in so finding. We make this determination in the interest of avoiding the expense and delay incident to another appeal. (Md. Rule 1085). See *Chalkley v. Chalkley,* 240 Md. 743; *Peed v. Peed,* 232 Md. 220 for a recital of the factors to be considered in fixing the amount of child support.

### IV

The fourth contention of the appellant is that by prohibiting her from having the company of "Randy" or any other boyfriend at the times when she was permitted to visit with the children and not placing a similar restriction upon the appellee when he was with the children, the chancellor denied the appellant equal protec-

tion of the law under the Fourteenth Amendment. In the light of the Court's remand of the matter of custody for further consideration by the chancellor, her contention is moot. However, since a similar restriction may be placed upon one of the parties and not on the other by a future custody order of the chancellor, we will decide the question under Md. Rule 1085 to avoid the possible expense and delay of another appeal. Such a condition imposed upon either party's right to have custody of the children must be based upon adequate proof that it is reasonable to believe that the association of the restricted parent with certain persons in the presence of the children would be contrary to their best interests. If the evidence shows that the associates of one parent would probably be harmful to the best interests of the children but that the associates of the other parent would probably not be, there is no requirement that equal restrictions be placed on both parents during the time he or she has custody. The equal protection clause of the Fourteenth Amendment guarantees only that equal protection of the law shall be given to all persons *under like circumstances* in the enjoyment of their civil and personal rights. See *Eggleston v. State,* 209 Md. 504; *In Re Careful Laundry,* 204 Md. 360.

## V

The appellant's fifth contention is that the chancellor erred in awarding only $250 to be paid by the appellee toward counsel fees for the two attorneys who represented her in the preparation for and trial of her case in the lower court. In the appellant's brief, counsel set forth that E. David Harr, Esquire, devoted 12.6 hours in preparation for the divorce trial and William W. Grant, Esquire, devoted 46.2 hours in preparation for and trial of the case below.

Md. Code, Art. 16, § 5 provides in substance that the husband shall only be required to pay counsel fees for his wife's attorney to the extent it appears from the evidence "that the wife's income is insufficient to care for her

needs." This provision was held by this Court in *Jackson v. Jackson*, 13 Md. App. 725, 734 to be applicable irrespective of the merits of the wife's case.

In *Waters v. Waters*, 191 Md. 436, the Court of Appeals in interpreting the statute said at 441:

> "* * * [C]ounsel fees should be awarded according 'to the ordinary factors of labor, skill, time, and benefit.' The amount of the fee also cannot be wholly disassociated from the financial resources of the party charged, * * *."

In *Danziger v. Danziger*, 208 Md. 469, the Court said at 475:

> "* * * The amount of the award of counsel fees is within the discretion of the chancellor and, although his discretion is subject to review by this Court, the award should not be disturbed unless he exercised his discretion arbitrarily or his judgment was clearly wrong. * * *"

Applying *Waters, Danziger,* and Art. 16, § 5 to the facts of the instant case, we hold that the chancellor did clearly abuse his discretion in allowing a joint counsel fee of only $250 to the appellant's attorneys for their services below. His order to this effect will therefore be reversed. We further conclude that since there is no proper evidence before this Court from which a determination can be made as to the time spent by counsel in preparation and trial below,[8] the issue must be remanded for further proceedings under Md. Rule 1071 a. However, if proper proof is presented to establish that counsel devoted the time indicated in their brief to the preparation and trial of the case, then they should be allowed a joint fee of $650. This fee should be divided between them in proportions to be agreed upon by them. If the evidence does not support the time set forth in the appellant's

8. There is no petition or other evidence in the record to establish the time spent by counsel for the appellant in the preparation and trial of this case in the lower court.

brief, then the lower court should award counsel fees in accordance with the standards set forth in *Waters, supra.* A fee of $350 is allowed Mr. Grant for legal services in prosecuting this appeal. The amounts mentioned include only that portion of the counsel fees which should be paid by the appellee.

> *That part of the decree dismissing appellant's bill for divorce a mensa and granting appellee a divorce a vinculo under his cross-bill affirmed; that part of decree awarding custody of minor children and awarding counsel fees below remanded without reversal or affirmance for further consideration in accordance with this opinion.*
>
> *Costs including a $350 counsel fee to appellant's solicitor for prosecuting the appeal, to be paid by appellee.*