ROSEANNE C. MARSHALL *v.* JON STEFANIDES

[No. 276, September Term, 1972.]

*Decided April 5, 1973.*

The cause was argued on December 7, 1972, before MOYLAN, POWERS and GILBERT, JJ., and reargued on March 8, 1973, before ORTH, C. J., and MORTON, THOMPSON, MOYLAN, POWERS, CARTER, GILBERT, MENCHINE, SCANLAN and DAVIDSON, JJ.

*W. Newton Jackson, III,* with whom were *Webb, Burnett & Simpson* on the brief, for appellant.

*Fulton P. Jeffers,* with whom were *Hearne, Fox & Bailey* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

This appeal involves the custody of children in the context of "[t]hose two fatal words, Mine and Thine." [1] The Circuit Court for Wicomico County and this Court are compelled to assume the role of Alexander and cut the Gordian knot [2] the parties have managed to tie.

Roseanne C. Marshall (Roseanne) and Jon Stefanides (Jon) began dating in 1962, when both were college students at Edinboro, Pennsylvania. In 1963, Roseanne became pregnant and Jon proposed marriage, but he "did not think it was satisfactory to rush right in." Later there was an attempt to marry in the District of Columbia, but because of the required waiting period between an application and the receiving of a license the effort was thwarted. The testimony concerning other arrangements to marry is conflicting. The parties, how-

---

1. Miguel De Cervantes, *Don Quixote,* Part I, Book II, Ch. 3 (1605).

2. According to one version of history, in 333 B.C. Alexander the Great cut the knot (presented by the Phrygian King, Gordius) as an omen of his right to rule Gordium. Williams, *Historian's History of the World,* Vol. 4, 295-296 (1908).

ever, lived together in Pennsylvania from 1964 until 1971, during which time a second son was born.

In 1971, they moved to Salisbury, Maryland, where Jon was employed by the Wicomico County Board of Education. The parties resided in Salisbury until Roseanne left the abode and went to Oil City, Pennsylvania, where, after having allegedly consulted an attorney, she married David Marshall (Marshall) in late January, 1972. The tug-of-war that then began between Jon and Roseanne for charge of the two children degenerated to a level where the parents were removing the children from each other's control under cloak-and-dagger type circumstances. On one occasion, Roseanne and Marshall traveled to Salisbury, and after observing the two boys riding their bicycles in the vicinity of their father's home, Roseanne and Marshall took the two boys and motored to Pennsylvania.

Apprehensive of his sons' welfare, and fearing either foul play or that some unfortunate accident had occurred, Jon notified the Salisbury police of his sons' absence. A search was conducted that evening and continued into the night. Jon did not learn of his sons' whereabouts until the next morning when notified by the police. Later, Jon journeyed to Oil City, Pennsylvania, where the principal of the school in which Roseanne had enrolled the boys allowed Jon to see his sons in the principal's office, in the presence of the principal and the principal's secretary. After the boys had inquired of their father as to what car he was driving, they were told to return to their classroom. When Jon went to his automobile, he discovered both sons in the car. Jon drove them to Salisbury, stopping enroute to notify Roseanne that he had taken the children with him at their request.

Jon filed suit in the Circuit Court for Wicomico County and prayed custody of the children. In his petition Jon alleged the marriage of the parties. Roseanne, in her answer to the petition, denied that she was married to Jon, asserted that the children had been "born to her out of wedlock" and further prayed custody of the chil-

dren. The matter came before the court for a hearing on the issue of custody.

During the course of the trial the Chancellor, over the objection of Roseanne's counsel, announced that he was going to interview the two children, ages eight and six, privately, in his chambers. Jon and one of his witnesses had completed their testimony. The parties and counsel were excluded from the "private interview." Upon completion of the interview the trial reconvened. Jon concluded his case and Roseanne went forward with the presentation of her evidence. The substance of the boys' statements at the interview was not revealed to the parties during the trial. His "Memorandum Opinion," wherein the trial judge states his reasons for granting custody of the two children to Jon, does allude, however, to certain information that he garnered from the children.

Jon relies upon *Sibley v. Sibley,* 187 Md. 358, 362, 50 A. 2d 128 (1946) to support his position that private interviews, in chambers, are not unknown to the courts of equity in custody matters. Our perusal of *Sibley* reveals that the only reference to a private interview with the child in that case is the sole sentence: "[The Chancellor] also had the opportunity to talk to the infant." Nowhere in the opinion of the Court is there any indication of the circumstances under which the Chancellor talked to the infant. We are not told whether the parties or counsel were present or if all were excluded.

A similar isolated sentence is contained in *Trenton v. Christ,* 216 Md. 418, 421, 140 A. 2d 660 (1958), wherein it is said: "The Chancellor had an opportunity to see and hear all of the witnesses, including the child."

In *Young v. Weaver,* 185 Md. 328, 44 A. 2d 748 (1945), the Court of Appeals remanded, without affirmance or reversal, and instructed the trial judge to conduct an "interrogation" of a fifteen year old boy as to his reasons for preferring to reside with foster parents rather than with his natural mother and her husband. Here

again, there is no indication as to the circumstances under which the Chancellor was to conduct the "interrogation." We do not think *Sibley, Trenton* or *Young* support Jon's position that the trial judge's interview in the instant case was proper.

In 99 A.L.R.2d, at 955-956, it is stated:

> "Basically, the cases involving a court's conducting a private interview with a child over whom there is a custody dispute are of two types: (1) where the parties have not consented to, nor acquiesced in, the informal procedure, and (2) where the interview is held pursuant to the actual or implied stipulation of the parties.
>
> "In the absence of waiver or consent, either the private interview is deemed generally proper, or it is never proper.
>
> "However, two major limitations of the rule accepting such an interview as generally proper narrow the distinction. Some cases indicate that a private interview is only proper where the court reveals the contents of the conversation prior to making the custody award, while other cases hold that such an interview is proper just so long as the award is based on evidence produced in open court rather than on information obtained in private." (Footnotes omitted).

Under the facts as they are revealed from the record in this case, the Chancellor's interview with the children simply does not fit into any of the expounded exceptions. It is patent that there was no stipulation for the interview because there was an objection, and consequently there was no waiver or consent. The Chancellor did not reveal "the contents of the conversation prior to making the custody award" nor did he ground his decision solely on the basis of the evidence produced in open court.

Roseanne argues that the "Memorandum Opinion" is predicated to a great extent upon information that the

Chancellor obtained from the boys in the private interview. She says that the presentation of her case, occurring in point of time after the interview with the two boys, placed her in the untenable position of being called upon to answer, explain, or defend the alleged preferences of her sons when she did not know what preferences or "desires" they had expressed. This, she contends, is manifestly unfair and a denial of due process. Jon, the father, had already presented his evidence and we assume, although we do not know because the record is silent on the matter, that the children were present in the court room at the time of that testimony. With Jon's evidence heard, the children possibly schooled thereby, and Roseanne's total lack of knowledge of what she was called upon to answer by way of the children's statements to the Chancellor, the interview was fundamentally unjust. *See Cook v. Cook,* 5 N. C. App. 652, 169 S.E.2d 29 (1969) ; *Baker v. Vidal,* 363 S.W.2d 158 (Tex. Civ. App. 1962).

We recognize that a child, particularly of young and tender years, could be subjected to severe psychological trauma because of a custody case. We are confronted, therefore, with an attempt to balance the right of the parents to present evidence as to what they deem to be in the best interest of the child as against possible severe psychological damage to the child. We believe that a Chancellor's interview of a child in a custody case out of the presence of the parties to be proper, in the discretion of the court, with or without the consent of the parties, and with or without the presence of counsel.

In all cases, unless waived by the parties, the interview must be recorded by a court reporter. Immediately following the interview its content shall be made known to counsel and the parties by means of the court reporter's reading of the record of that interview to them. In so holding, we share the view of some jurisdictions that a trial judge should be allowed to conduct an *in-camera* interview with the child or children to the exclusion of the litigants or counsel, if some means of appellate re-

view of the interview is available.[3] We, however, add the requirement that the court reporter shall make known immediately to the parties and counsel the content of the interview. This should be done *sans* the presence of the child or children.

We believe the method that we have hereinabove outlined minimizes, as much as possible, the psychological impact on the child, and at the same time allows interested parties to produce all the evidence that is necessary to enable the court to arrive at a fair and just determination in accordance with the best interest of the child.

It is obvious that the interview in the instant case was not consented to and that the substance of the interview was not reported. From his "Memorandum Opinion," it is pellucid that the Chancellor relied to a great extent upon the information he garnered from his private conversation with the children.[4]

We hold that the private interview between the children and the Chancellor under the circumstances of this

---

3. *Oakes v. Oakes*, 45 Ill. App. 2d 387, 195 N.E.2d 840 (1964); *Stickler v. Stickler*, 57 Ill. App. 2d 286, 206 N.E.2d 720 (1965); *Currier v. Currier*, 136 N.W.2d 55 (Minn. 1965); *Schwartz v. Schwartz*, 382 S.W.2d 851 (Ky. 1964). *Contra, Lincoln v. Lincoln*, 24 N.Y.2d 270, 299 N.Y.S.2d 842, 247 N.E.2d 659 (1969); *Bailey v. Bailey*, 3 Ariz. App. 138, 412 P. 2d 480 (1966).

4. The Chancellor states in his Memorandum:

"[Roseanne's] marriage to Mr. Marshall may or may not be valid; but, in the minds of the two boys, at least, she is living in adultery. While they, of course, did not use that terminology in private conference with the Court, the two boys are completely unable to understand how their Mother can be married to Mr. Marshall without first having obtained a divorce from their Father. Also, in that private conference with the Court, the boys confirmed the testimony of their Father that Mr. Marshall and their Mother lived together prior to the marriage ceremony. . . .

\* \* \*

"The two boys, in private conference with the Court, expressed a desire to continue to live with their Father. . . . As above stated, however, they cannot understand their Mother's present relationship with Mr. Marshall. They believe that [Marshall] is at least partially responsible for the separation of their parents. . . . All legal niceties aside, they are unable to accept the acquisition of a second Father under the circumstances stated."

case constitutes reversible error, and we therefore remand the matter for further proceedings.

We deem it advisable for the guidance of the trial court to discuss other factors relating to this appeal. Rule 1085.

Neither Roseanne nor Jon served upon the other a notice to rely upon the foreign law, *i.e.*, the common law of Pennsylvania. There was some testimony, albeit conflicting, that Jon and Roseanne held themselves out to be husband and wife in Pennsylvania where common law marriages are said to be recognized. The Chancellor, however, specifically declined to rule on the validity of the marriage. He said:

> "Regardless of Pennsylvania law, this court is not going to determine whether or not they were validly married in Pennsylvania under Pennsylvania law or any other law.
>
> The Court is interested in knowing the relationship that existed between them, what their thinking was during the time they lived together, what their thinking is now.
>
> I am going to overrule the objection, but I will tell you right now that I have no intention of ruling in this case whether or not they are, or were, married under the law of any state."

As a result of the remand, either of the parties may desire to invoke the "Uniform Judicial Notice of Foreign Law Act." For proper utilization of foreign laws, see Md. Ann. Code Art. 35, §§ 47-53, and *Prudential Ins. Co. v. Shumaker,* 178 Md. 189, 197, 12 A. 2d 618 (1940).

A common law marriage that is valid in the State of Pennsylvania would be recognized in Maryland. *Laccetti v. Laccetti,* 245 Md. 97, 225 A. 2d 266 (1967); *Henderson v. Henderson,* 199 Md. 449, 87 A. 2d 403 (1952); *Bannister v. Bannister,* 181 Md. 177, 29 A. 2d 287 (1942). Thus, if foreign law is invoked, and the parties are found to be married under the common law of Pennsylvania, the court may award custody to either the father or the mother, subject to the general rule that award of custody

is always made in the best interest of the children. *Kauten v. Kauten,* 257 Md. 10, 261 A. 2d 759 (1970); *Orndoff v. Orndoff,* 252 Md. 519, 250 A. 2d 627 (1969); *Shanbarker v. Dalton,* 251 Md. 252, 247 A. 2d 278 (1968); *Deckman v. Deckman,* 15 Md. App. 553, 292 A. 2d 112 (1972); *Mullinix v. Mullinix,* 12 Md. App. 402, 278 A. 2d 674 (1971); *Widdoes v. Widdoes,* 12 Md. App. 225, 278 A. 2d 100 (1971); *Sullivan v. Auslaender,* 12 Md. App. 1, 276 A. 2d 698 (1971).

If the provisions of Art. 35, §§ 47-53 are invoked and it is determined that the relationship of the parties was not sufficient to constitute a valid marriage under Pennsylvania law, the children would be illegitimate.

In *Butler v. Perry,* 210 Md. 332, 340, 123 A. 2d 453 (1956), the Court of Appeals said: "[t]he putative father is not entitled to custody," and cited *Ramsay v. Thompson,* 71 Md. 315, 18 A. 592 (1889) as its authority. In *Butler,* a contest for custody of a minor child arose between the maternal and the paternal grandparents. Both sought guardianship of the issue of Marjorie Butler and Warren Scott, Jr., who had lived together as man and wife for several years without ever having married. Scott, Jr. was convicted of the murder of Marjorie Butler, which murder was committed in the presence of the youngster whose custody was sought by the respective grandparents. A child psychologist stated that the child should be given to the paternal grand-parents and based his report on the premise that the child's father would eventually gain custody of his child. To this the court answered, "[t]he putative father is not entitled to custody." We think that the quoted portion of *Butler* was not meant to apply to more than its specific facts and was not intended to be a general statement of the Maryland law.

Even if *Butler, supra,* is not limited to its own particular facts, we do not think it is controlling. *Ramsay v. Thompson, supra,* upon which the quoted statement in *Butler* was premised, states at 317:

"It is a well settled principle in the law of

domestic relations, in this country at least, that as between the mother and the putative father of a natural child, *the mother is the natural guardian, and has the right to the care and control of the child, during the age of minority, unless it be otherwise expressly provided by statute.*" (Emphasis supplied).

In 1963, 7 years after *Butler* was decided and 74 years after *Ramsay* had suggested that if the "principle" that "the mother is the natural guardian" is to be changed, it must be "expressly provided by statute," the General Assembly enacted Chapter 722, § 1, Md. Laws, which repealed and reenacted with amendments Art. 16, § 66. That section reads in relevant part:

"(a) The several equity courts of this State shall have original jurisdiction in all cases relating to the custody, guardianship, *maintenance and support of legitimate and illegitimate* children, and on *the* bill or petition filed by the father, mother, relative, next of kin, or next friend of any *such* child or children, *or by the public welfare official of the county or the City of Baltimore where such child or children may be found, the equity court may* direct who shall have the custody or guardianship of such child or children and who shall be charged with his, her or their support and maintenance, pendente lite or permanently, and may, from time to time thereafter annul, vary or modify its decree or order in relation to such child or children, provided that nothing herein contained shall be construed to take away or impair the jurisdiction of the several courts in this State in cases relating to dependent or delinquent children.

* * *

(c) *In the case of an illegitimate child or children, proceedings on the bill or petition shall be made in accordance with the provisions of*

*the subtitle "Paternity Proceedings" of this article; and the equity courts of this State shall have the additional jurisdiction and power as provided in the subtitle."* (Italicized portions indicate 1963 amendment).

At the same time, the General Assembly enacted Art. 16, §§ 66A-66P. The legislative policy was stated in § 66A, which says:

"The General Assembly declares its conviction that the State has a duty to ameliorate the deprived social and economic status of children born out of wedlock and that the policies and procedures as contained in this subtitle and in § 66 of this Article relative to establishing the paternity of such children, determining who shall have their custody or guardianship and who shall be charged with their maintenance and support are socially necessary and desirable, having as their threefold purpose (1) the promotion of the general welfare and best interests of such children by securing to them, as near as practical, the same right to support, care and education as legitimate children; (2) the imposition upon both parents of such children the basic obligations and responsibilities of parenthood and (3) the simplification of procedures."

We think that by the adoption of the 1963 amendments to Art. 16, the Legislature conferred upon both the father and the mother of illegitimate children the right to seek custody of the children. The statute also authorizes a court of equity to award custody to either of them, subject to the caveat that such an award be made only in the best interest of the children.

The statutes, above quoted, make clear that the equity courts have jurisdiction *"in all cases relating to the custody,* guardianship, maintenance and support *of legitimate and illegitimate children,* and on the bill or petition filed by the *father* [or] mother . . . the equity

court may direct who shall have the custody or guardianship of such child or children . . .," subject to the "promotion of the general welfare and best interests of such children."

The Juvenile and Domestic Relations Court, Union County, New Jersey, in the case of *In re Guardianship of C,* 98 N. J. Super. 474, 237 A. 2d 652 (1967), discussed the question of the right of the father of illegitimate children to seek custody. The Court concluded, after an exhaustive review of the authorities, both pro and con, that the father had such a right. The New Jersey court noted that Maryland, in *Butler v. Perry, supra,* had expressed a contrary view, but pointed out, as do we, that *Butler* was influenced by the factual situation from which it arose.

This Court, in *Kirstukas v. Kirstukas,* 14 Md. App. 190, 194, 286 A. 2d 535 (1972), quoted from *Hild v. Hild,* 221 Md. 349, 357, 157 A. 2d 442 (1960), wherein it is stated:

> "Since the mother is the natural custodian of the young and immature, custody is ordinarily awarded to her, at least temporarily, in legal contests between parents when other things are equal, even when the father is without fault, provided the mother is a fit and proper person to have custody."

We said at 196-197, quoting from Nelson, *Divorce and Annulment,* (2d Ed. 1945), § 15.09, "Mother favored by law," that:

> "However, the rule that a mother should be given preference in awarding the custody of her children is not inflexible, nor is the mother entitled to the custody of a daughter as a matter of law, the welfare of the child being paramount, the preference in favor of the mother of young children being resorted to merely to aid the court to determine what is for the best

interests of the children. Under some circumstances the best interests of the children will be served by giving their custody to their father or some other person, even though the children are of tender age, or girls, and the mother is a morally fit person for the trust. Thus, the general rule that a mother should be awarded custody of her children is modified in special cases in order to give precedence to the rule that the paramount consideration is the welfare of the child."

We conclude that the law of Maryland is that the father of illegitimate children may not be denied the right to seek custody of those children. *Stanley v. Illinois,* 405 U. S. 645, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972). While the mother is still regarded as the favored custodian for children of young and tender years, *Hild v. Hild, supra,* such a view does not preclude the father from demonstrating that if it is in the best interest of the child, he should be granted custody.

> *Order reversed and case remanded for further proceedings not inconsistent with this opinion.*
> *Costs to be paid by appellee.*