# BONNIE GAIL NUTWELL *v.* PRINCE GEORGE'S COUNTY DEPARTMENT OF SOCIAL SERVICES

[No. 678, September Term, 1973.]

*Decided April 23, 1974.*

The cause was argued before POWERS, GILBERT and LOWE, JJ.

*Thomas E. Walker*, with whom was *Tyler G. Webb* on the brief, for appellant.

*Virginia S. Criste, Associate County Attorney for Prince George's County*, with whom was *Joseph S. Casula, County Attorney for Prince George's County*, on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

A decree of the Circuit Court for Prince George's County granted, over vigorous objection by the natural mother, the petition of the Prince George's County Department of Social Services for "guardianship with right to consent to adoption and/or long-term care" of two minor children. The decree severed not only all natural parental rights, but contemporaneously reft the children's common bond with their brother and sister who were not the subject of the petition.

The mother and appellant, Bonnie Gail Nutwell, contends in this Court that (1) the Chancellor erred in determining that her refusal to consent to adoption was contrary to the best interest of the children, and (2) the trial court erred in holding an interview with the children absent an express waiver of the appellant-mother and without informing the appellant of the substance of the interview. We think she is right in both contentions and for the reasons stated *infra* we reverse the decree.

## THE FACTS

The two children, Yvonne and Tracy, were, at the time of the hearing, ages nine and six respectively. They are the issue of what the appellant characterized as a "rocky" marriage between her and Harry Francis Nutwell, the

father, who, while served with a copy of the petition, did not answer it or appear at the hearing.

A recounting of a brief history of this case must commence with the night of February 6, 1971. The appellant was at that time experiencing marital difficulties that she stated were attributable to her husband's "staying out late all the time drinking." Appellant left Yvonne and Tracy with a babysitter and went to look for her husband. While she was gone, the husband returned, dismissed the sitter, packed his clothes and left. The two children were left alone so they set out for their maternal grandmother's home. A police officer stopped them and, after questioning, took them to the maternal grandmother. When appellant returned home she discovered that her husband and the children were gone. Appellant says that she assumed that her husband had taken the children to his mother. The next day the appellant's mother turned the children over to Royce and Violet Blair of Stafford, Virginia. The Blairs were no strangers to the appellant's mother as the appellant's brother was married to the daughter of the Blairs. A few days later a summary proceeding was held in the Circuit Court for Prince George's County, and the Blairs were awarded temporary custody of the children. According to the appellant — and not contested — she was not notified of that hearing. In June of 1971 care and custody was given to the appellee "because the Blairs were not an AFDC [1] eligible

---

1. "AFDC [Aid to Families with Dependent Children] is one of several major categorical public assistance programs established by the Social Security Act of 1935, and as we described in *King v. Smith,* 392 U. S. 309, 316-317 (1968), it is founded on a scheme of cooperative federalism:

'It is financed largely by the Federal Government, on a matching fund basis, and is administered by the States. States are not required to participate in the program but those which desire to take advantage of the substantial federal funds available for distribution to needy children are required to submit an AFDC plan for the approval of the Secretary of Health, Education, and Welfare (HEW). 49 Stat. 627, 42 U.S.C. §§ 601, 602, 603, and 604. See [U.S. Advisory Commission Report on Intergovernmental Relations, Statutory and Administrative Controls Associated with Federal Grants for Public Assistance 21-23 (1964)]. The plan must conform with several requirements of the Social Security Act and with rules and regulations promulgated by HEW. 49 Stat. 627, as amended, 42 U.S.C. § 602 (1964 ed., Supp. II). See also HEW, Handbook of Public Assistance, pt. IV, §§ 2200, 2300 . . . .'
See also *Rosado v. Wyman,* 397 U. S. 397, 407-409 (1970).

Under the Social Security Act, HEW withholds federal funds for

relative and [they] needed help in supporting the children, so [appellee] took care and custody and began supporting them in August [19]71." There is nothing in the record to indicate that appellant was apprised of that proceeding either. The Blairs' home is now considered a "foster home of [the appellee] agency."

The appellant first became aware of the fact that the children had been turned over to the Blairs in February 1971 because her mother told her so. Appellant did not object to the Blairs' having the children with them at that time because of the appellant's personal and marital problems. Appellant knew the Blairs and was seemingly satisfied that they would take good care of the children.

Matters continued on in the *status quo*, until the appellee notified the appellant by letter in March, 1972 of its intention to obtain guardianship with the right to consent to adoption. Appellant immediately contacted the social worker who had written the letter in behalf of the appellee, and she interposed her objection to the guardianship. At the same time the appellant requested visitation rights.

Later on in the same month the appellant again contacted the appellee and requested a meeting with the social worker as well as a visitation with the children. Appellant was allowed to meet with the children on March 26, 1972, for three hours. The testimony is in conflict as to the circumstances under which the visit with the children was held. Mrs. Blair testified that she was not present during the visit. The appellant, on the other hand, stated that the meeting was held in the kitchen of the Blairs' home, and that both Mr. and Mrs. Blair remained in the room during most of the visit. The appellant, further, testified that she made seven attempts to contact the social worker in an effort to arrange other visitations, but the social worker in her testimony said that she was unaware of any such efforts on

implementation of a state AFDC plan until compliance with the Act and the Department's regulations. HEW may also terminate partially or entirely federal payments if 'in the administration of the [state] plan there is a failure to comply substantially with any provision required by section 602(a) of [the Act] to be included in the plan.' 42 U.S.C. § 604. See *King v. Smith, supra,* 392 U. S. at 317 n. 12; *Rosado v. Wyman, supra,* 397 U. S. at 420-422." *Hagans v. Lavine,* No. 72-6476 at n. 1 (U.S. March 25, 1974).

the part of the appellant. Mrs. Blair told the Chancellor that the children had received presents from their mother on the "first Christmas", and she let the children have them. On another occasion, however, some mail was sent to the children by their mother and Mrs. Blair intercepted the letters and returned them. She also said that she gave "one small package and . . . one other birthday card" — sent by appellant — to the children's grandmother without the children having ever seen them.

The appellee filed on June 6, 1972 the petition for guardianship with right to consent to adoption. In August of the same year the appellant filed appearance in the case and refused to consent to the appellee's petition. In February of 1973 the appellant, her attorney, a social worker and an attorney for the appellee met. At that meeting appellant advised that she desired an opportunity to straighten herself out so that she could again have custody of her own children. The social worker gave the appellant three months to conform to the agency's requirement that (1) she find adequate housing, (2) find a job other than housekeeper, (3) agree to see a therapist and (4) not visit with the children during that period of time. In an apparent effort to comply with the social worker's edict, the appellant quit her job as housekeeper and began therapy. Additionally she sought, with the assistance of the appellee, vocational rehabilitation. Because of an unsatisfactory personal relationship between the appellant and an employee of the therapist, the appellant discontinued the therapy. There is a disagreement in the testimony as to whether the appellant actually halted the therapy or merely refused to continue under the direction of the employee as distinguished from the doctor in charge. There was evidence, however, that the appellant was scheduled to see a therapist the week following the trial of this matter. There was further testimony that the appellant in February of 1973 had been convicted of operating a motor vehicle while under the influence of alcohol, and that she was on probation for that offense.

After separation from her husband and during the period of February 1971 through the date of trial, June 12, 1973, appellant established a history of involvement with male

companions. At the trial J. M. Dulaney testified that he and the appellant planned to be married as soon as the appellant and her husband were divorced. The divorce was then pending in the District of Columbia on the ground of voluntary separation. The appellant had not contributed toward the support of the children after February of 1971, although we are unable to find in the record before us that any demand was ever made upon her to do so. Moreover, we are unable to find in this record that any demand was made upon the father for the support of the children.[2] The appellant stated that she loved her children, was breaking away from her old group of friends, intended to marry Mr. Dulaney whose income was $225 to $300 per week, was making an effort to have her oldest two children live with her and hoped that she could eventually have all of her children in her home with her and her new husband.

On June 18, 1973 the Chancellor entered a decree in which he granted long term care to the appellee "with the suggestion that the petition be repeated at the end of two years." Both parties filed motions for reconsideration. Thereafter the court entered a decree on September 5, 1973, striking its earlier decree and granting the relief prayed in the appellee's petition.

## I.

The Court of Appeals in *Walker v. Gardner*, 221 Md. 280, 157 A. 2d 273 (1960), speaking through Judge Hammond (later Chief Judge) stated, at 284:

> " . . . '[T]he welfare and best interests of the child are the primary considerations in all adoption proceedings', *Winter v. Director*, 217 Md. 391, 396 [143 A. 2d 81, 84 (1958)]; *King v. Shandrowski*, 218 Md. 38, 42-43 [145 A. 2d 281, 284 (1958)]. Unlike awards of custody, however, adoption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring. The

---

2. It is evident from the record that certain files of the appellee were introduced into evidence but then withdrawn. We have no way of knowing what was contained in those files.

consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships has led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent.

'[T]he Court of Appeals has indicated that it will not permit trial courts to decree adoptions over the expressed objection of the natural parent or parents, save in very strong cases,' Strahorn *Adoption in Maryland*, 7 Md. L. Rev. 275, 295 [(1943)]. Nevertheless, in strong cases this court has said of [Md. Ann. Code Art. 16, § 74]: "We should not read into that statute an absolute, arbitrary veto on the part of a parent.' *Lagumis v. Ex Parte Lagumis*, 186 Md. 97, 106 [46 A. 2d 189, 193 (1946)]."

*See also Schwartz v. Hudgins*, 12 Md. App. 419, 425, 278 A. 2d 652, 655 (1971); *Goodyear v. Cecil Co. Dep't of Soc. Serv.*, 11 Md. App. 280, 273 A. 2d 644 (1971), *rev'd*, 263 Md. 611, 284 A. 2d 426 (1971), on the ground that the record supported the conclusions reached by the trial judge.

In *Beltran v. Heim*, 248 Md. 397, 401, 236 A. 2d 723, 725 (1968), the Court noted that Md. Ann. Code Art. 16, § 74 provides:

" . . . [A]n adoption shall not be granted without the consent of the persons or agencies specified in subsections (a) through (h) unless 'the court finds that such consent . . . [is] withheld contrary to the best interests of the child.' Under § 74(b) the consent of both natural parents is required unless they have lost their 'parental rights through court action or voluntary relinquishment or abandonment.' "

Abandonment as used in § 74(b) has been defined to mean a wilful and intentional conduct on the part of the parent

that manifests an intent to relinquish all parental rights to the child, and to renounce and forsake the child entirely. *Logan v. Coup,* 238 Md. 253, 258, 208 A. 2d 694, 697 (1965). *See also Beltran v. Heim, supra* at 402; *Ex Parte Johnson,* 247 Md. 563, 567, 233 A. 2d 779, 781 (1967). In the case now before us there is evidence that the appellant neglected her children and failed to support them, but there is no evidence that she abandoned the children within the meaning of *Logan, Beltran* and *Johnson,* all *supra.* Moreover, we observe that in this case, there is nothing to indicate that the "foster parents" seek to adopt the children so that the finding of the Chancellor that the children are "pleased with their present home" is not an answer. Under the decree the appellee would have the right to consent to the adoption by a person presently unknown to this proceeding, and the children would be, if the court approved the adoption, uprooted from their present environment and placed in another.

This Court in *Sullivan v. Auslaender,* 12 Md. App. 1, 4, 276 A. 2d 698, 700 (1971), stated that in custody cases:

" . . . [W]e are not bound by the strictures of the clearly erroneous rule, but rather exercise our best judgment, in determining that 'ultimate' question of 'transcendent' and 'paramount' and 'controlling' importance, whether the conclusion of the chancellor was the best one for the welfare, benefit, and interest of the child."

The same rule applies to adoption proceedings. *Ex Parte Frantum,* 214 Md. 100, 105, 133 A. 2d 408, 411 (1957). When we apply our independent duty to determine from the record whether the Chancellor's decision was in the best interest of the children, we have no hesitancy in holding that the Chancellor's finding that the appellant withheld her consent contrary to the best interest of the children, is simply not supported by the record.[3] In so holding, we are not

---

**3.** We are aware that the General Assembly enacted Laws of 1973, ch. 296, effective July 1, 1973. Chapter 296 is also codified as Md. Ann. Code Art. 16, § 75. It provides:

(a) After a child has been under continuous foster care for a

unmindful that during oral argument the appellee reluctantly, but candidly, admitted its petition was motivated in part by the appellee's desire to shift the burden of the support of the children from the appellee to adoptive parents.

## II.

As a general rule, once we determine an issue requiring reversal we terminate our opinion. Nevertheless, we deem it advisable in this case to depart from the usual custom and to discuss appellant's second contention. In the memorandum filed by the Chancellor on June 18, 1973, it is stated:

" The children were seen by the Court on the day

period of two consecutive years under the custody of an agency authorized by law to make placements, it shall be presumed by the court that it is in the best interests of the child to award to that agency a decree granting guardianship with the right to consent to adoption or long term care short of adoption, without the consent of the natural parent or parents; provided that notice otherwise required by law has been given.

(b) The court in considering evidence to rebut this presumption, among other factors, shall consider the following:

(1) The interaction and interrelationship of the child with his natural and foster parent or parents, his siblings, and any other person who may significantly affect the child's best interests;

(2) The child's adjustment to his home, school, and community; and

(3) The mental and physical health, of all individuals referred to in subparagraph (1).

(c) Additionally, in order to rebut the presumption, the court shall require substantial proof that:

(1) The natural parent will be able to resume his or her parental duties within a reasonable period of time; or

(2) The natural parent has played a constructive role in the child's welfare during the time he has been in foster care.

In evaluating the parent's role, the court may consider, among other factors, (1) the frequency and regularity of personal contact with the child, (2) demonstrated love and affection, (3) parental arrangement for the child's future education and financial support, both in relation to the parent's means.

(d) Nothing herein shall prevent a child under foster care from being adopted pursuant to § 74 even if the period of continuous foster care is less than two consecutive years."

The trial judge quoted at length from the new law, but observed that it was not effective until after the date of the hearing. Even if § 75 had been effective our disposition under the circumstances of this case would be the same.

of the hearing without the presence of anyone and were interviewed by the Court for a short period of time. They appear to be well cared for and pleased with their present home."

We have meticulously examined the record, and there is absolutely nothing in the record indicating, expressly or implicitly, that the appellant knew that the interview with the children had occurred until the Chancellor's opinion and order was filed. In *Marshall v. Stefanides*, 17 Md. App. 364, 302 A. 2d 682 (1973), we said, at 369:

" . . . We believe that a Chancellor's interview of a child in a custody case out of the presence of the parties to be proper, in the discretion of the court, with or without the consent of the parties, and with or without the presence of counsel.

In all cases, unless waived by the parties, the interview must be recorded by a court reporter. Immediately following the interview its content shall be made known to counsel and the parties by means of the court reporter's reading of the record of that interview to them. In so holding, we share the view of some jurisdictions that a trial judge should be allowed to conduct an *in-camera* interview with the child or children to the exclusion of the litigants or counsel, if some means of appellate review of the interview is available. We, however, add the requirement that the court reporter shall make known immediately to the parties and counsel the content of the interview [unless waived]. This should be done *sans* the presence of the child or children." (Footnote omitted).

We were aware in *Marshall v. Stefanides, supra,* that the interview requirements may present some problems in some cases, but we believed then, and still believe, that our holding minimized "as much as possible, the psychological impact on the child" and at the same time did not deny the litigants due process. Inasmuch as there may be some question as to the manner in which the record should reflect

the waiver, by the litigants, of the court reporter's presence during the interview of the children, we now hold that the record must affirmatively show the waiver, and that what we said in *Marshall v. Stefanides, supra,* is applicable to adoption cases as well as custody cases.

*Decree reversed; costs to be paid by the appellee.*