BELTRAN *v.* HEIM

[No. 32, September Term, 1967.]

*Decided January 5, 1968.*

*Motion for rehearing filed January 19, 1968; denied February 6, 1968 and opinion modified.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, McWILLIAMS and SINGLEY, JJ.

*Harvey B. Steinberg* for appellant.

*Nicholas J. Fotos* for appellee.

HORNEY, J., delivered the opinion of the Court.

The question presented by this appeal is whether the natural father unlawfully withheld his consent to the adoption of his daughter by the present husband of his former wife. The chancellor decreed adoption.

The natural father, Claudio F. Beltran, was born in Costa Rica and is a naturalized citizen of Venezuela. He married the mother of the child, Catherine E. Beltran, *nee* Anderson (whose present married surname is Heim), on March 14, 1960, while he was a student at the American University. The child, Marie-Claudette Odilie Beltran, was born in Washington, D. C., on

October 24, 1963. The parents separated in February of 1964. The mother met her present husband later in the same year.

The adoptive father, William Peter Heim, a graduate of the Naval Academy and a veteran of the Korean War, is a major in the Marine Corps presently serving as a commanding officer of the Marine Barracks at Annapolis. Ever since his marriage to the mother and custodian of the child, the three of them have lived together as a family.

When the mother filed suit for a divorce against the natural father alleging adultery, the District of Columbia granted a partial divorce on the grounds of cruelty, awarded custody of the child to the mother and ordered the father to contribute to her support. Thereafter the mother went to the Virgin Islands and obtained an absolute divorce from the natural father and married the adoptive father on August 1, 1965.

After the separation, but prior to the divorce, the natural father had extramarital relations with the woman who is now his wife and as a result a son was born to them out of wedlock in December of 1964. For a while, pursuant to the court order, the natural father made regular support payments but they gradually diminished. At the time of the adoption hearing he had made no payments for more than a year. The excuse offered was that since he had to discharge past indebtedness and support his illegitimate son he did not have the money. In addition to what it cost to take his present wife to soccer games and thereafter to restaurants in company "with a whole bunch of fellows and girls" and to repay the bank loans he had made to pay for automobile parts and other merchandise, a part of the indebtedness was incurred to make a trip without his first wife to visit his parents in South America.

The petition for adoption was filed in October of 1965 and the case was referred to the county welfare board. On the completion of its preliminary investigation, the board, because the parties were newlyweds, recommended that the adoption be delayed for at least a year. The final report, however, stating that the Heims had firmly established their marriage and that there was "a strong bond of mutual affection between the child and her stepfather," recommended approval of the adoption.

At the hearing, the adoptive father testified that having known the child for two years, he considered her to be his daughter, that he "loved her very much" and wanted to adopt her so as to make her "legally my daughter." He stated as another reason that he desired to establish his "rights toward Marie" in case "anything happened" to his wife. There was no contention that the home he provided was not adequate or that he was an unfit father. Indeed, the record clearly indicates the contrary. His wife testified that she wanted the adoption primarily because she knew that her present husband would adequately care for the child if anything happened to her, but also because her former husband had demonstrated his irresponsibility as a parent and husband.

While there was evidence to the effect that although the natural father resided within an hour's drive from his former wife, he had visited the child on only five occasions during the fifteen month period prior to the hearing and had never requested to be alone with the child on such visits, the record also shows that the mother and stepfather always stayed with the child during each of the visitation periods; that the natural father telephoned "two or three times" to ask about the child; that he gave the child Christmas presents, a birthday present on her second birthday and sent her a card on her third birthday; that he took his father (during a visit from South America) to see the child; that he named his daughter as a cobeneficiary with his son in his life insurance policy and retirement plans; and that he continued to maintain the benefits of Blue Cross and Blue Shield for the child. When the natural father was asked why he refused to agree to the adoption he said that he would not give the child up because she had "his name and his blood."

The chancellor, in weighing the infidelities of the natural father before separation and his adulterous conduct prior to divorce, the inclination of the father to spend money on himself and others rather than his family and the sporadic support of the child even under compulsion as against the assured benefits of a stable home, an abundance of parental care and affection and the assurance of future security which would accrue to the child should the petition be granted, found that the consent of the natural father had been withheld contrary to the best

interests of the child, that the withholding of consent was not legally justifiable and that the best interests of the child would be served by allowing adoption. The decree, besides ordering that the child was the lawfully adopted daughter of the adoptive father, further provided that her surname should be changed from Beltran to Heim.

Unless there is some reason to the contrary, we will not disturb the findings of a chancellor in an adoption proceeding. *In The Matter of Malmstedt,* 243 Md. 92, 220 A. 2d 147 (1966). In the present case, however, the finding of the chancellor that the consent of the natural father had been withheld contrary to the best interests of the child, is not supported by the record. There was evidence that the natural father had neglected the child and had failed to support her, but there was also evidence that the natural father had not abandoned the child.

Code (1966 Rep. Vol.), Article 16, § 74, states that an adoption shall not be granted without the consent of the persons or agencies specified in subsections (a) through (h) unless "the court finds that such consent or consents are withheld contrary to the best interests of the child." Under § 74 (b) the consent of both natural parents is required unless they have lost their "parental rights through court action or voluntary relinquishment or abandonment."

"As in custody cases, 'the welfare and best interests of the child are the primary considerations in all adoption proceedings.' *Winter v. Director,* 217 Md. 391, 396; *King v. Shandrowski,* 218 Md. 38, 42-43." *Walker v. Gardner,* 221 Md. 280 at 284, 157 A. 2d 273 at 275 (1960) ; Also see *Watson v. Dockett,* 229 Md. 63, 68, 181 A. 2d 461, 463 (1962).

"Unlike awards of custody, however, adoption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships have led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent." *Walker v. Gardner, supra,* at p. 284 of 221 Md., and p. 275 of 157 A.

2d. Also see *Logan v. Coup,* 238 Md. 253, 256, 208 A. 2d 694, 696 (1965).

Whether there has been an abandonment by the parent or whether consent has been withheld contrary to the best interests of the child is determined by the facts in each case. *Shetler v. Fink,* 231 Md. 302, 190 A. 2d 76 (1963). In *Logan v. Coup, supra,* we had occasion to say, at p. 258 of 238 Md., and p. 697 of 208 A. 2d, "that 'abandonment,' as used in * * * Section 74 (b), imports any wilful and intentional conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child, and to renounce and forsake the child entirely." Also see *Ex Parte Johnson,* 247 Md. 563, 567, 233 A. 2d 779, 781 (1967). *Cf. McClary v. Follett,* 226 Md. 436, 174 A. 2d 66 (1961).

There are several reasons why the record does not support the finding of abandonment. The natural father, in addition to occasionally visiting the child, inquiring as to her health and sending her gifts, named her as a cobeneficiary in his life insurance and retirement plans and maintained hospitalization and medical care for her. Failure to support does not necessarily constitute abandonment. *Connelly v. Jones,* 165 Md. 544, 170 Atl. 174 (1934). Moreover, while the irresponsibility and marital indiscretions of the father would be very relevant on the issue of custody, such faults without abandonment are not enough to justify severance of the parental relationship. The child now has and has had for more than two years most of the benefits and privileges that would devolve upon her by an adoption. In addition to this, the mother already has decretal custody but as she as well as the stepfather are apprehensive with regard to the care and welfare of the child should anything happen to the mother, we see no reason why both of them should not be authorized to jointly perform the custodial obligations.

*Decree reversed; appellee to pay the costs.*