## LINDA HICKS *v.* PRINCE GEORGE'S COUNTY DEPARTMENT OF SOCIAL SERVICES

[No. 36, September Term, 1977.]

*Decided July 20, 1977.*

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ., and DAVID T. MASON, Associate Judge of the Court of Special Appeals, specially assigned.

*Lawrence J. Ageloff,* with whom were *David C. Brown* and *Holt, Lee & Ageloff* on the brief, for appellant.

*Amicus curiae* brief filed by James Leon Cover and Linda Cover, *Paul E. Rosenberg* on the brief.

*Alan E. D'Appolito, Associate County Attorney,* with whom were *James C. Chapin, County Attorney,* and *Michael O. Connaughton, Deputy County Attorney,* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

This appeal arises out of a "Petition for Guardianship With Right to Consent to Adoption And/Or Long-Term Care," filed by the Prince George's County Department of Social Services (for convenience referred to herein as the County), which was consolidated for hearing with a related petition for adoption filed by foster parents of the minor child, Donna Hicks (Donna), who is the subject of these proceedings. The Circuit Court for Prince George's County denied both petitions. An in banc panel of three judges, however, convened pursuant to Art. IV, § 22 of the Maryland Constitution, to which the County had submitted

reserved points and questions, reversed the chancellor and granted the County's petition. Donna's natural mother, Linda Hicks, appellant here, took an appeal to the Court of Special Appeals, but we granted certiorari before the case was heard by that court. We agree that the chancellor's decision should be reversed, but, for reasons that follow, we remand to the circuit court for further proceedings.

The events culminating in this dispute began shortly after appellant's marriage — her second — to Donald Guy on October 27, 1972. She was a registered nurse who had suffered since 1968 from alcoholism and drug abuse. Donna was born on May 30, 1973. Prior to her birth, however, the Guys were experiencing serious marital discord. Their marriage took a decided turn for the worse some three months before Donna's birth, when Mr. Guy informed appellant that he wished to sever the marriage and to place their expected child for adoption. Although appellant initially acquiesced, she ultimately decided against adoption. When she brought the child from the hospital to their home in Cheverly, her husband reacted violently and began heaping considerable abuse on appellant. She found herself unable to cope with this situation and began drinking heavily.

Conditions deteriorated to the point where a representative of Catholic Charities found it necessary to remove Donna and appellant's other daughter by her first marriage. The older daughter ultimately went to live with her father. These developments led to a finding by the Circuit Court for Prince George's County, sitting as a Juvenile Court, that Donna was a dependent child in need of care and supervision, and to a decision that she be committed to the care and custody of the Department of Social Services for temporary placement.

In September 1973, Donna commenced to reside with foster parents (the Bakers) in Prince George's County. She continued to live with them until March 1974, when she was described as suffering from cerebral palsy, a diagnosis which later was proved incorrect. At that time, when she was nine months' old, her custody was transferred to another foster couple (the Covers), who were the petitioners

in the adoption proceeding heard by the chancellor. Given the erroneous diagnosis of cerebral palsy, the Bakers believed themselves emotionally incapable of dealing with a child stricken with such a disease. It was after Donna began to live with the Covers, who accepted her on the assumption that she was afflicted with cerebral palsy, that the earlier diagnosis proved to be incorrect. In any event, Donna has continuously resided with the Covers since March 1974, and according to the evidence appears to have responded favorably to that environment.

Following Donna's placement in the Baker home, appellant continued to reside in Prince George's County and therefore visited her daughter regularly. She maintained the same schedule even after moving in November 1973 to Baltimore City, where she found employment as a registered nurse at a hospital. Her visits virtually ceased in December, however, when she entered a treatment program for alcoholics in Baltimore. It was during this period that she met her present husband, also a recovering alcoholic, whom she later married in April 1975. She began drinking again in early 1974, but after entering Alpha House, a short-term treatment center, she discontinued her drinking, and has not done so since February 21, 1974. This represents by far her longest period of abstinence since the onset of her drinking problems.

In March 1974, appellant and Mr. Hicks entered Just House, where they successfully underwent a long-term treatment program. There, she was advised by the director of that program, as she had previously been counselled at Alpha House, that she not visit her daughter while undergoing treatment and recovery. She complied and visited her only twice during the first 18 months of Donna's stay at the Cover household. Appellant did, however, maintain telephone contact with the County. On these occasions, she reported to county social workers the progress made by her and Mr. Hicks, who had recovered to the point where he was operating a successful home improvement business. She included in her reports the news of her marriage to Mr. Hicks, the birth of their son in June 1975,

and their occupancy of an attractive house in the city, as each event occurred.

On September 22, 1975, two years and four days from the date on which the juvenile court judge had signed the order assuming jurisdiction over Donna's case, a county social worker wrote to appellant:

> "Your daughter, Donna Guy, has been in foster care for two years now. Our Agency would like to make a definite plan for Donna's future. You have had very little involvement with and shown little interest in Donna since I became her caseworker over a year ago. I would like to see her placed permanently in her foster home. In order to do this it is necessary to obtain your consent to grant guardianship of Donna to the Prince George's County Department of Social Services so that she may be released for adoption.
>
> "Foster care is meant to be only a temporary placement for a child until a permanent plan can be arranged. Please give careful thought to this matter and consider what would be in the best interest of Donna. You may call me collect . . . . I am waiting to hear from you."

This letter elicited an immediate response from appellant, who promptly went to Prince George's County to see the social worker. On that occasion appellant refused to sign a consent to adoption and commenced a schedule of weekly visits with Donna.

Appellant then filed a petition seeking a review of the juvenile court commitment. Following a hearing on that petition in January 1976, the juvenile court master, before whom appellant and her husband testified, requested a report from the Department of Social Services of Baltimore City on the Hicks' and on their home. The master then concluded the hearing with this observation:

> "Well, I can tell you this. The Court is definitely impressed with the progress of the mother and her

> present husband and they have indicated to my satisfaction . . . their real honest desire to have this child returned. . . ."

A representative of the Department of Social Services promptly visited the Hicks' home in Baltimore and then forwarded to the County a report that was favorable to appellant, recommending that Donna be returned to her. The County never delivered a copy of the report to the master or to appellant, but instead filed its guardianship petition in April 1976, after obtaining a consent to adoption from Mr. Guy.

The chancellor heard testimony from appellant and the Covers, and both county and city employees of the Department of Social Services. In general, the city social workers, who were thoroughly acquainted with the Hicks and their home, but not with the Covers, strongly supported appellant in her efforts to have Donna. Conversely, the county social workers, who were familiar only with the other side of the picture, were equally firm in recommending that the petitions be granted. Additionally, a pyschiatrist, who was also unfamiliar with the Hicks', testified that it would be detrimental to Donna for her then to be taken from the Covers. At the conclusion of the hearing, the chancellor denied both petitions, but, as we have indicated, the in banc panel, which heard the case only on an appeal taken by the County, reversed and granted the guardianship petition.

Appellant advances six grounds for reversal in this Court, all of which focus on errors allegedly committed by the court in banc. Among those arguments are claims that her rights to procedural due process under both the Federal and State Constitutions, and her right to equal protection under the Federal Constitution, were violated by the County. She also contends that the court in banc lacked jurisdiction because the appeal to that tribunal was not properly perfected. *But see Medical Examiners v. Steward,* 207 Md. 108, 111, 113 A. 2d 426 (1955) (court in banc had power to decide question of its own jurisdiction). We need not reach any of the questions posed by appellant, even assuming arguendo that we can

review alleged errors of the court in banc, *but see Buck v. Folkers,* 269 Md. 185, 187, 304 A. 2d 826 (1973); *State Roads Comm. v. Smith,* 224 Md. 537, 540, 168 A. 2d 705 (1961); *Costigin v. Bond,* 65 Md. 122, 124, 3 A. 285 (1886), since, in any event, the chancellor misapplied the controlling statute.

Prior to 1973, when § 75 was added, the consent requirement in cases of both guardianship preceding adoption and adoption was governed solely by Maryland Code (1957, 1966 Repl. Vol., 1972 Cum. Supp.) Art. 16, §§ 72 and 74. In a long line of cases, we have read those provisions, particularly § 74,[1] to mean that adoption should not be granted over parental objection unless that course was clearly justified, since such proceedings result in drastic and permanent severing of the strongest and most basic relationships. *Dawson v. Eversberg,* 257 Md. 308, 313, 262 A. 2d 729 (1970); *Lippy v. Breidenstein,* 249 Md. 415, 420, 240 A. 2d 251 (1968); *Beltran v. Heim,* 248 Md. 397, 401-402, 236 A. 2d 723 (1968); *Walker v. Gardner,* 221 Md. 280, 284, 157 A. 2d 273 (1960). This has not meant, of course, that the natural

---

1. Section 74, in relevant part, provides:

". . . [T]he court may grant a petition for adoption without any of the consents hereinafter specified, if, after a hearing the court finds that such consent or consents are withheld contrary to the best interests of the child.

"Consent to any proposed adoption shall be obtained from:

\* \* \*

"(b) Both the natural parents, if married, if they are alive and have not lost their parental rights through court action or voluntary relinquishment or abandonment; or

"(c) One natural parent, if the other is not alive or has lost his parental rights as mentioned in (b) above; or

\* \* \*

"(f) The legal guardian of the person to be adopted, if parental rights with right to consent to adoption, or long-term care short of adoption, as provided in § 72 above, has been transferred by court action to such guardian; or

"(g) The executive head of any public or private child care or child placement institution or agency which through court action under § 72 above, or voluntary relinquishment has been given the care, custody and control of the person to be adopted, including the right to consent to such an adoption, or long-term care short of adoption . . . ."

\* \* \*

parent is permitted an absolute, arbitrary veto. *Walker v. Gardner*, 221 Md. at 284; *Lagumis v. Ex Parte Lagumis*, 186 Md. 97, 106, 46 A. 2d 189 (1945); *Nutwell v. Pr. Geo's Co. Soc. Serv.*, 21 Md. App. 100, 106, 318 A. 2d 563 (1974). The primary considerations are the welfare and best interests of the child. *Lippy v. Breidenstein*, 249 Md. at 420; *Walker v. Gardner*, 221 Md. at 284. Nevertheless, as one commentator was moved to observe from our earlier cases, adoption will not be decreed "over the expressed objection of the natural parent or parents, save in very strong cases." Strahorn, *Adoption in Maryland*, 7 Md. L. Rev. 275, 295 (1943).

By its terms, § 74 requires as a precondition to adoption that the natural parents consent if they "have not lost their parental rights through court action or voluntary relinquishment or abandonment"; it further provides, however, that the court may dispense with this requirement if it "finds that such consent or consents are withheld contrary to the best interests of the child."

One of the primary considerations, then, in determining whether a consent is withheld contrary to the best interests of the child is whether there was wilful abandonment on the part of the natural parent. *Logan v. Coup*, 238 Md. 253, 257, 208 A. 2d 694 (1965). Other important considerations are failure to contribute to support, neglect to see or visit the child, and unfitness of a natural parent. *Shetler v. Fink*, 231 Md. 302, 308, 190 A. 2d 76 (1963). "Abandonment," within the meaning of § 74, "imports any wilful and intentional conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child, and, to renounce and forsake the child entirely." *Logan v. Coup*, 238 Md. at 257-58. *Accord, Beltran v. Heim*, 248 Md. at 402; *Nutwell v. Pr. Geo's Co. Soc. Serv.*, 21 Md. App. at 106-107. This test manifestly imposes a difficult, if not frequently insurmountable, burden on anyone alleging abandonment on the part of a natural parent. *See, e.g., Beltran v. Heim*, 248 Md. at 402 (failure to support not necessarily abandonment; nor were marital indiscretions); *Logan v. Coup*, 238 Md. at 258-59 (naming child as beneficiary of life insurance despite

cessation of visits and financial support held sufficient to rebut abandonment).

It was against this background of statutory and decisional law that the General Assembly enacted Chapter 296 of the Laws of 1973, effective July 1 of that year, which added a new section 75 to Article 16.[2] In effect, the Legislature carved out an exception in foster care cases to the existing requirements concerning the consent of natural parents to guardianship and adoption. It did so by creating a presumption in those instances in which the child had been in continuous foster care for two years under the custody of an authorized agency, to the effect that, in the best interests of the child, the agency should be awarded guardianship with the right to consent to adoption or long-term care short of adoption *without* the consent of the natural parent or

---

2. Section 75 provides:

"(a) After a child has been under continuous foster care for a period of two consecutive years under the custody of an agency authorized by law to make placements, it shall be presumed by the court that it is in the best interests of the child to award to that agency a decree granting guardianship with the right to consent to adoption or long term care short of adoption, without the consent of the natural parent or parents; provided that notice otherwise required by law has been given.

"(b) The court in considering evidence to rebut this presumption, among other factors, shall consider the following:

"(1) The interaction and interrelationship of the child with his natural and foster parent or parents, his siblings, and any other person who may significantly affect the child's best interests;

"(2) The child's adjustment to his home, school, and community; and

"(3) The mental and physical health of all individuals referred to in subparagraph (1).

"(c) Additionally, in order to rebut the presumption, the court shall require substantial proof that:

"(1) The natural parent will be able to resume his or her parental duties within a reasonable period of time; or

"(2) The natural parent has played a constructive role in the child's welfare during the time he has been in foster care.

"In evaluating the parent's role, the court may consider, among other factors, (1) the frequency and regularity of personal contact with the child, (2) demonstrated love and affection, (3) parental arrangement for the child's future education and financial support, both in relation to the parent's means.

"(d) Nothing herein shall prevent a child under foster care from being adopted pursuant to § 74 even if the period of continuous foster care is less than two consecutive years."

parents. Where the burden of proof had been on the agency, it is now shifted to the natural parent in those cases in which § 75 is applicable. In addition, the new statute imposed criteria required to be considered by the court on the question whether the presumption has been rebutted and standards of proof to be sustained by the natural parent in overcoming the presumption.

It was in the application of § 75 to the facts of this case that the chancellor erred. As we suggested earlier, that section was applicable to this case because Donna had been in continuous foster care for a period of two consecutive years under the custody of an agency authorized by law to make placements. In fairness to the chancellor, who rendered a comprehensive and thorough oral opinion at the conclusion of the testimony, he made what appears to be a studied effort to consider all of the criteria set forth in subsection b of the statute. In light of our disposition of this case, no useful purpose would be served by a detailed reference to his summary. The error occurred, however, in his interpretation of § 75, demonstrated by his statement that "any evidence tending to show that there was not an abandonment or voluntary relinquishment of a child is sufficient to overcome the presumption created by Article 16 Section 75 . . . ." Thus, said the chancellor:

> ". . . I do hold that the presumption applies in this case, the presumption created by Article 16 Section 75, but I also hold that there has been sufficient evidence to rebut that presumption, and that there has been evidence which shows that there was not an abandonment on the part of the mother . . . .

> * * *

> "So I would conclude and find that the consent was not withheld contrary to the interests of the child in these cases . . . ."

In so holding, the chancellor failed to apply the § 75 (c) standard of proof required to rebut the presumption

favoring the County. To rebut that presumption, subsection c requires "substantial proof" that:

> "(1) The natural parent will be able to resume his or her parental duties within a reasonable period of time; *or*
>
> "(2) The natural parent has played a constructive role in the child's welfare during the time he has **been in foster care**." (emphasis added).

Subsection c also includes additional factors to be considered by the court in "evaluating the parent's role."

The court in banc, which gave equally careful consideration to this case, as reflected in its extensive written opinion, correctly noted the requirements of § 75, but rather than rest its decision on the chancellor's incorrect application of the statute, determined that appellant had "failed to produce sufficient evidence to rebut the presumption contained in Article 16, § 75." In addition, despite its appellate status, it acted as a trier of fact in weighing the evidence presented by the County against that produced by appellant, and then proceeded to an ultimate disposition:

> "... Though the decision is a difficult one, the Court, in reaching the result it has chosen, stresses the fact that Donna's future with her natural mother is uncertain and problematical, while her future in the continued care and custody of the Petitioner, Prince George's County Department of Social Services, appears certain and optimistic. ..." (citation omitted).[3]

---

**3.** Earlier in its opinion, the in banc court had said that "in its independent judgment, [it] finds that the welfare, benefit, and best interests of Donna Lynn Guy require a reversal of the Chancellor's judgment ...." *But see* Ross v. Hoffman, 280 Md. 172, 186, 372 A. 2d 582 (1977); Davis v. Davis, 280 Md. 119, 125-26, 372 A. 2d 231 (1977) (appellate court should not make independent assessment of evidence when chancellor has properly applied the law and his findings of fact are not clearly erroneous), both of which, of course, were decided long after the in banc panel heard this case.

To the extent, then, that he applied non-abandonment by the natural mother as the test in this case, where the presumption created by Art. 16, § 75 was the decisive issue, the chancellor misconceived the statute. The appropriate course to be taken in this circumstance, however, is a remand to the circuit court, where, in light of this opinion, the chancellor should apply the statute to the evidence which has been presented, and make a new determination under the County's petition. It should be clear that we express no opinion as to the ultimate disposition to be made by the chancellor.[4]

> *Decree of Circuit Court reversed and remanded to the Circuit Court for Prince George's County for further proceedings in conformity with this opinion; costs to abide the result.*

---

4. Placement of a child in foster care is, of course, ordinarily intended as a temporary solution to a family's problems. The difficulties frequently encountered in determining the most ideal permanent solution are, as this case aptly demonstrates, a sensitive and controversial subject. *See generally* Smith v. Organization of Foster Families for Equality and Reform, 431 U. S. 816, 97 S. Ct. 2094, 53 L.Ed.2d 14 (1977).