MARY M. COFFEY *v.* DEPARTMENT OF SOCIAL SERVICES OF BALTIMORE CITY ET AL.

[No. 471, September Term, 1978.]

*Decided February 7, 1979.*

The cause was argued before Liss, Wilner and MacDaniel, JJ.

*Richard F. Pecora,* with whom were *Lawrence B. Coshnear, John Greene, Elizabeth S. Baker* and *John Eidleman* on the brief, for appellant.

*Amicus curiae* brief filed by Maryland Social Services Administration, *Francis Bill Burch, Attorney General, Joel J. Rabin* and *Margaret E. Rawle, Assistant Attorneys General,* on the brief.

*Bernard A. Greenberg, Assistant City Solicitor for Baltimore City,* with whom were *Benjamin L. Brown, City*

*Solicitor, William Hughes, Associate City Solicitor,* and *William R. Phelan, Jr., Assistant City Solicitor,* on the brief, for appellee Department of Social Services of Baltimore City. *J. Barry Meinster* for other appellee.

LISS, J., delivered the opinion of the Court.

It has been said, "This world is a comedy to those who think, a tragedy to those who feel." [1] The feelings of the protagonists in this controversy are ample proof of the truth of that observation.

This case arose out of a petition filed in the Circuit Court of Baltimore City by the Department of Social Services of Baltimore City, one of the appellees, by which it sought the guardianship with the right of consent to adoption of Lloyd Freeman, Jr., an infant and other appellee in this case. A petition was filed in the same forum, on behalf of the infant, in which the appointment of an attorney to represent the minor child's best interest was requested. The mother of the minor child, Mary M. Coffey, appellant, represented by the Legal Aid Bureau, filed an answer in which she refused to consent to the child's adoption and complained that she had been denied her child visitation rights. After a hearing on preliminary motions, the two petitions were merged into one case and counsel for the child was permitted to intervene in the original proceedings. The case came on for trial after full and complete investigation by the Supreme Bench Medical Office and the Department of Social Services, and in the voluminous testimony of numerous witnesses at the trial the following facts were developed: Lloyd Freeman, Jr. was an illegitimate child born to the appellant on January 8, 1969. The mother had a history of mental retardation, having been tested as having an I.Q. of 58, and both before and after the birth of the child she was confined to Spring Grove State Hospital for varying periods of time. Within two months of the child's birth, she was committed to Spring Grove State Hospital, and by an order of the Juvenile Court of Baltimore City, the child was found to be a dependent and neglected

---

1. Letters to the Countess of Upper Ossory, Horace Walpole, Aug. 1766.

child and was remanded to the custody of the Department of Social Services. The Department placed the child in the foster home of Howard and Anna Kuhn where he has remained since that date. During the period the child has been in the Kuhn home, the mother was permitted visitation on several occasions, the first of these occasions having occurred when the child was twenty months old. These visits were suspended in December of 1970 because of the "upset of [the] child." The visits were resumed in September of 1973, and the mother was permitted to visit the child on four other occasions before the "upset of [the] child" warranted another suspension of visitation rights by order of the Department. A formal hearing was subsequently held before the State Hearing Officer of the Department, and he reversed the Department's order suspending visitation.

On January 17, 1975, the appellee (Department) filed its petition for guardianship with the right to consent to adoption pursuant to Article 16, Section 72 of the Annotated Code of Maryland (1957, 1973 Repl. Vol.) which states, in part:

> (a) A petition for adoption, . . . may be preceded by a petition for guardianship with the right to consent to adoption, and such guardianship decree, which the courts having jurisdiction of adoption matters may require and shall have power to grant after such hearing and investigation as the court may deem appropriate, shall terminate natural parental rights, duties and obligations and the duly appointed guardian's consent to an adoption, for which the petition may be filed in the same proceeding, shall eliminate the necessity of further notice to the natural parent or parents.

Article 16, Section 74, provides with regard to consent:

> Every petition for adoption shall be accompanied by written statements of consent, subscribed and sworn to before a person authorized by law to administer an oath, as specified in this section, except that the court may in its discretion permit any petition to be filed without a necessary consent if

> such consent is added to the petition before the time set for hearings. However, the court may grant a petition for adoption without any of the consents hereinafter specified, if, after a hearing the court finds that such consent or consents are withheld contrary to the best interests of the child.

At the trial, it was stated that the Department proposed to consent to the adoption of the minor child of the appellant by the Kuhns, the foster parents, who had had custody of the child for nine years.

Testimony by doctors who appeared as witnesses on behalf of the Department stated the child suffered from minimal brain dysfunction, was disturbed both psychologically and physically, was severely depressed, had problems with perceptual and conceptual learning, and suffered from nightmares and bed wetting. They indicated the enforced visitation rights were at least partially to blame for the child's problems, and that whenever the child was forced to visit with the mother, the child's physical and psychological problems were exacerbated. Dr. Gregory F. Pulle, the child's treating psychiatrist, stated "that the child's symptoms get worse when he goes to those supervised visits." Dr. Alfred Lucco, a human development and clinical psychology expert, testified that "the visits by Mrs. Coffey not be continued at this point because the association with his natural mother reinforces for Lloyd the threat of being removed from the Kuhn home." Dr. Scovill, a board psychiatrist, concluded, "Those visits must have been very frightening experiences for him because he seemed frightened of me," and "Lloyd knew his visits with me related to the issue of whether he would be adopted or not." Nicholas Conti, social worker for the Supreme Bench of Baltimore City, concluded that no visitation should take place now or in the near future. He testified Lloyd was the first child in his experience that "has not openly and frankly discussed issues with me. Rather Lloyd . . . tightened himself up . . . . [H]e leaned back . . . and froze and remained frozen for twenty-five minutes." Mr. Conti further testified "the best interest of the child would be for him to remain in the Kuhn family."

The sole witness who disagreed with these conclusions was Dr. Sharon Duffey, a board certified psychiatrist who testified as an expert on behalf of Mrs. Coffey. She stated that Lloyd's visits with his mother should continue as she (Dr. Duffey) felt it would be harmful for Lloyd to be completely cut off from all further contact with his natural mother.

It is noteworthy, we believe, that the natural mother was, as expressed by the chancellor, "fighting for visitation which takes place a few times a year in which she sees the child in the presence of a social worker." Pitted against her were the Department of Social Services of Baltimore City, the foster parents, and the court designated counsel for Lloyd, all of whom sought not only to deny visitation rights but to terminate all relations between the mother and the child by granting adoption to the foster parents.

The chancellor concluded it would be in the best interest of the child to grant guardianship of Lloyd Freeman, Jr. to the Department of Social Services of Baltimore City with the right to consent to adoption or to consent to long-time care short of adoption in accordance with Code Article 16, Section 72 with the further right to change the name of the minor. The chancellor made it clear that he proposed to grant adoption to the Kuhns and suggested that the order granting guardianship with the right to consent to adoption and the adoption decree be presented at the same time in order that both be signed chronologically. The trial judge signed an order granting guardianship as we have indicated but refrained from signing the final adoption order when he was advised an immediate appeal to this Court was contemplated. It is from the order granting guardianship with the right to consent to adoption that this appeal was filed.

Appellant raises four issues to be decided by this appeal:

1. Did the lower court commit reversible error by excluding as irrelevant proffered evidence of alleged agency misconduct which resulted in the illegal commitment of her infant child, deprived her of her rights of visitation with the child, and contributed to the chancellor's conclusion that the mother was unreasonably withholding consent to adoption contrary to the best interests of the child?

2. Did the lower court err in applying an incorrect best interests standard, excluded testimony as to the meaning of "best interests" and ruled that appellant unjustifiably withheld consent?

3. Did the lower court err in applying the "preponderance of evidence" standard rather than the "clear and convincing evidence" standard of proof in reaching its conclusion that the natural mother unreasonably withheld consent to adoption?

4. Did the lower court arbitrarily refuse to apply the constitutional doctrine of the "state's least restrictive intrusion" into the mother's right to family integrity?

1.

The scope of review of a trial court's decision in adoption proceedings is generally limited to whether the trial court abused its discretion or whether the findings of fact by the trial court were clearly erroneous. Maryland Rule 1086; *Davis v. Davis*, 280 Md. 119, 372 A. 2d 231, *cert. denied*, 434 U. S. 939, 98 S. Ct. 430, *reh. denied*, 434. U. S. 1025, 98 S. Ct. 754 (1977); *Ross v. Hoffman*, 280 Md. 172, 372 A. 2d 582 (1977); *Bernhardt v. Lutheran Social Services*, 39 Md. App. 334, 385 A. 2d 1197 (1978). In *Davis, supra,* the Court of Appeals said:

> When the appellate court scrutinizes factual findings, the clearly erroneous standard of Rules 886 and 1086 applies. If it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion. 280 Md. at 125-26.

These standards of appellate scrutiny are equally applicable in custody and adoption cases. *Bernhardt, supra.*

In *Walker v. Gardner,* 221 Md. 280, 157 A. 2d 273 (1960), the Court of Appeals said:

> As in custody cases, "the welfare and best interests of the child are the primary considerations in all adoption proceedings." [Citations omitted]. Unlike awards of custody, however, adoption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships had led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent. 221 Md. at 284.

*Accord, Hicks v. Prince George's County,* 281 Md. 93, 375 A. 2d 558 (1977).

The determination whether parental consent is being withheld contrary to the best interests of the child necessarily depends on the facts and circumstances of each case. *See Goodyear v. Cecil County Department of Social Services,* 11 Md. App. 280, 273 A. 2d 644, *rev'd,* 263 Md. 611, 284 A. 2d 426 (1971) (on ground that record supported conclusions reached by trial judge).

Appellant proffered evidence below to prove that the Department of Social Services acting under color of law, systematically, wrongfully, and arbitrarily undermined the appellant's parent-child relationship in this case by arranging the commitment of Lloyd without giving the mother notice or the opportunity to contest the commitment. That, further, the agency systematically denied to the mother her reasonable visitation rights while Lloyd was in the Kuhns' foster care. The chancellor refused to receive such evidence on the ground that it was irrelevant to the issue before the trial court. We cannot find his ruling on the admissibility of this evidence to be clearly erroneous. The determination

required to be made by the chancellor in the case *sub judice* was what was in the best interests of the child at the time the case was presented to him for decision. To rehash and reopen factual controversies dating back a period of nine years would have served no useful purpose.

We find it significant that while counsel for the Legal Aid represented the appellant from the beginning of the continuing controversy over the best interests of Lloyd and the claims of his mother, that the issue of the alleged defective commitment was never raised or decided in the several administrative hearings in this case. At the time of the commitment, appellant was confined to a mental hospital. No one in any way connected to the appellant, whether by blood or marriage, was prepared to offer a home to the then two-month-old infant, and we think that it was fortuitous circumstances which produced the Kuhns, who were prepared to provide, and have provided over the last nine years, a loving home for this child. Appellant attempts for the first time to raise the constitutional issue of the failure to provide due process to the mother at the time the child was determined by the Juvenile Court to be a dependent and neglected child. We believe the proffer as to the facts surrounding the original commitment was properly refused, and that the evidence was irrelevant to the principal issue before the chancellor of what was in the best interests of the child. In fairness, however, we must agree that the appellant had a justifiable complaint when she contended that the Department of Social Services had been less than cooperative in helping her to maintain her parent-child relationship with Lloyd.

The record discloses that Lloyd was sent to a Dr. Risemberg at Baltimore City Hospitals in 1974 and 1975 for psychological evaluation. Dr. Risemberg recommended that counseling be instituted with both the foster mother and the natural mother in order to improve the situation insofar as visitation was concerned. At the time of the hearing, Dr. Risemberg, in consultation with Dr. Duffey, reaffirmed that recommendation. There is nothing in the record to indicate that the agency made any effort to implement that recommendation. However, these facts were before the

chancellor and were included in the voluminous exhibits filed in the case. It is clear that the chancellor weighed with great care the conduct of the agency in balancing the respective rights of the mother and the best interests of the child. We find no basis for concluding that there was error on the part of the chancellor in his rulings on the proffered evidence on these issues.

2.

Article 16, Section 72 of the Annotated Code of Maryland specifies that guardianship, with the right to consent to adoption, is to be treated in the same manner as adoption. As we have previously noted, the Court of Appeals in *Walker v. Gardner, supra,* stated that adoption [guardianship with right to consent to adoption] is a drastic permanent action since it destroys a parent's inherent natural right (*see* Simpson, *The Unfit Parent: Conditions Under Which a Child May Be Adopted Without the Consent of his Parent,* 39 U. Det. L.J. 347, 352-54 (1962)) and makes a parent a legal stranger to his own offspring, *Beltran v. Heim,* 248 Md. 397, 236 A. 2d 723 (1968); *White v. Seward,* 187 Md. 43, 48 A. 2d 335 (1946). Due to the extreme nature of the relief, the Court should refrain from granting adoption except in exceedingly strong cases, Strahorn, *Adoption in Maryland,* 7 Md. L. Rev. 275 (1943); *Lloyd v. Schutes,* 24 Md. App. 515, 332 A. 2d 338 (1975); *Schwartz v. Hudgins,* 12 Md. App. 419, 278 A. 2d 652 (1971) where it is clearly justified, *Walker, supra; Beltran, supra;* and where there is clear and sufficient legal reason requiring such harsh relief, *Logan v. Coup,* 238 Md. 253, 208 A. 2d 694 (1965).

Appellant complains bitterly that Maryland is among the small minority of states which provide statutory authority for adoption without consent where it is in the best interest of the child. She suggests that the standard defies judicial definition, and because it is prone to subjective determination, it is likely to be abused and to result in judicial confusion. We find no difficulty in applying that standard whatsoever. We agree with the ruling of the trial court that the appellant's

proffer of testimony as to the appellant's interpretation of the phrase "best interests of the child" should have been denied. The decisions of our Court of Appeals as well as our own rulings gave the chancellor ample guidance in determining the meaning of the phrase.

There was, however, one other source of guidance available to the chancellor. The Legislature of Maryland, in Article 16, Section 75 created a presumption as to a child who remained in foster care for more than two consecutive years. That section provides:

(a) After a child has been under continuous foster care for a period of two consecutive years under the custody of an agency authorized by law to make placements, *it shall be presumed by the court that it is in the best interests of the child to award to that agency a decree granting guardianship with the right to consent to adoption or long term care short of adoption, without the consent of the natural parent or parents;* provided that notice otherwise required by law has been given.

(b) The court in considering evidence to rebut this presumption, among other factors, shall consider the following:

(1) The interaction and interrelationship of the child with his natural and foster parent or parents, his siblings, and any other person who may significantly affect the child's best interests;

(2) The child's adjustment to his home, school, and community; and

(3) The mental and physical health of all individuals referred to in subparagraph (1).

(c) Additionally, in order to rebut the presumption, the court shall require substantial proof that:

(1) The natural parent will be able to resume his or her parental duties within a reasonable period of time; or

(2) The natural parent has played a constructive role in the child's welfare during the time he has been in foster care.

In evaluating the parent's role, the court may consider, among other factors, (1) the frequency and regularity of personal contact with the child, (2) demonstrated love and affection, (3) parental arrangement for the child's future education and financial support, both in relation to the parent's means.

(d) Nothing herein shall prevent a child under foster care from being adopted pursuant to Section 74 even if the period of continuous foster care is less than two consecutive years. (emphasis supplied)

The effect of this section is to carve out a legislative exception in those cases where a child has been in foster care for two consecutive years. In the case *sub judice,* the child has been in foster care for more than nine years. We conclude that the appellant in this case was required by this section to offer evidence sufficient to rebut the presumption that it was in the best interests of the child to grant the Department a decree granting guardianship with the right to consent to adoption or long-term care short of adoption without the consent of the natural parent. *See Hicks v. Prince George's County Department of Social Services, supra; Nutwell v. Prince George's County Department of Social Services,* 21 Md. App. 100, 318 A. 2d 563 (1974).

Appellant offered no proof that she would be able to resume her parental duties within a reasonable period, and because of her unfortunate limitations, she was not likely to be able at any time in the future to provide for the child's education or financial support. The chancellor concluded that it was in the best interests of the child that adoption be decreed. We find no clear error.

### 3.

Appellant states that the chancellor abused his discretion by applying a "preponderance of the evidence" test instead

of a "clear and convincing evidence" standard in reaching his conclusion that the natural mother unjustifiably withheld consent to the agency's petition for guardianship with the right to consent to adoption.

Appellant argues that the specific interest at stake in this case is the value of a natural parent's relationship to her child. It is her contention that the State may not, consistent with the Due Process Clause of the Fourteenth Amendment, sever the natural parent's relationship to her child unless it proves by clear, convincing and unequivocal evidence that such severance is in the best interest of the child. *See The Matter of Adoption of J.S.R.,* 374 A. 2d 860 (D.C. 1977). Appellant argues that the chancellor below used the preponderance of evidence standard and that there was substantial evidence from which the chancellor should have found that the best interest of the child would be served by keeping the child in foster care with the Kuhns, by allowing the natural mother meaningful visitation rights and by assuring that Lloyd continued to receive needed psychotherapy.

We do not find in the record any indication as to which of the standards — preponderance of the evidence or clear and convincing proof — was utilized by the chancellor. We do not accept the suggestion that this case *requires* a different standard of proof than the standard usually applied in similar civil matters. We know of no decision by our Court of Appeals which suggests the clear and convincing standard is required to be utilized either in custody or adoption cases.

The traditional measure of persuasion in civil cases is by a preponderance of evidence. The clear and convincing evidence standard is a more exacting measure which is utilized only in certain specific cases. McCormick, Evidence Section 340, at 797-98 (2d ed. 1972) lists the classes of cases in which this special standard of persuasion has been applied:

> Among the classes of cases to which this special standard of persuasion has been applied are the following: (1) charges of fraud and undue influence, (2) suits on oral contracts to make a will, and suits to establish the terms of a lost will, (3) suits for the

specific performance of an oral contract, (4) proceedings to set aside, reform or modify written transactions or official acts on grounds of fraud, mistake or incompleteness, and (5) miscellaneous types of claims and defenses, varying from state to state, where there is thought to be special danger of deception, or where the court considers that the particular type of claim should be disfavored on policy grounds.

In any case, we think this issue is academic in the present case. In the light of Article 16, Section 75, we do not believe that the adoption of the clear and convincing standard would be justified under the facts and circumstances of this case and leave that issue for determination at some other time. In any event in these proceedings, the chancellor stated that he found "beyond a reasonable doubt" that the best interests of the child would be served by adoption by the foster parents and the termination of visitation rights. Such a finding is itself expositive of the issue.

4.

Appellant, finally, urges that the termination of her parental status and rights involves a fundamental liberty which the Supreme Court of the United States has held is protected by the First, Ninth and Fourteenth Amendments. She cites in support of that position a series of cases which, upon close examination, are distinguishable from the case *sub judice*. *Moore v. East Cleveland,* 431 U. S. 494, 97 S. Ct. 1932 (1977) concerned a zoning ordinance held to be unconstitutional which limited occupancy of a dwelling unit to members of a single family but defined the family in a way which made it a crime for a grandmother to live with her grandson. *Meyer v. Nebraska,* 262 U. S. 390, 43 S. Ct. 625 (1923) found a criminal statute unconstitutional which made it a crime to teach reading in the German language to a child of ten years who had not attained and passed the eighth

grade. In *Stanley v. Illinois,* 405 U. S. 645, 92 S. Ct. 1208 (1972), an Illinois statute was found unconstitutional which declared the child of an unmarried deceased mother a dependent, and which had the State assume custody of the child without an opportunity for the natural father to be heard on the issue of his fitness to be a parent to the child. In *Wisconsin v. Yoder,* 406 U. S. 205, 92 S. Ct. 1526 (1972), members of the Amish religion were freed from the application of the State's compulsory school attendance law which was held violative of the Amish people's exercise of their right of free speech and religion.

Appellant cites *Quilloin v. Walcott,* 434 U. S. 246, 98 S. Ct. 549 (1978), which approximates the factual situation in the present case, which indicated that under Georgia law no adoption of a child born in wedlock was permitted without the consent of each living parent (including divorced or separated parents) who had not voluntarily surrendered rights in the child or who had not been adjudicated an unfit parent. Another section of the Georgia Code provided that only the mother's consent was required for the adoption of an illegitimate child. Appellant, father of an illegitimate child, was denied authority to prevent the adoption of the child by the husband of the child's mother. Appellant contended that the Georgia law violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

Mr. Justice Marshall, in delivering the unanimous opinion of the Court, said:

The fact that appellant was provided with a hearing on his legitimation petition is not, however, a complete answer to his attack on the constitutionality of sections 74-203 and 74-403(3). The trial court denied appellant's petition, and thereby precluded him from gaining veto authority, on the ground that legitimation was not in the "best interests of the child"; appellant contends that he was entitled to recognition and preservation of his parental rights absent a showing of his "unfitness." Thus, the underlying issue is whether, in the circumstances of this case and in light of the

authority granted by Georgia law to married fathers, appellant's interests were adequately protected by a "best interests of the child" standard. We examine this issue first under the Due Process Clause and then under the Equal Protection Clause.

## A

Appellees suggest that due process was not violated, regardless of the standard applied by the trial court, since any constitutionally protected interest appellant might have had was lost by his failure to petition for legitimation during the 11 years prior to filing of Randall Walcott's adoption petition. We would hesitate to rest decision on this ground, in light of the evidence in the record that appellant was not aware of the legitimation procedure until after the adoption petition was filed. But in any event we need not go that far, since under the circumstances of this case appellant's substantive rights were not violated by application of a "best interests of the child" standard.

We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected. See, *e.g., Wisconsin v. Yoder, supra; Stanley v. Illinois, supra; Meyer v. Nebraska, supra.* It is cardinal with us that "the custody, care and nurture of the child resides first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). And it is now firmly established that "freedom of personal choice in matters of . . . family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639-640, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974).

We have little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to

force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." *Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 862, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring). But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except appellant. Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, was in the "best interests of the child."

On the equal protection issue, the Court held that the State was not barred from recognizing the difference of responsibility between a divorced father and the natural father of an illegitimate child. The latter, while legally required to provide maintenance and support, is not usually required to shoulder any significant responsibility for the daily supervision, education, protection and care of the child. The Supreme Court found no violation of the Due Process and Equal Protection Clauses and affirmed the Georgia Court.

The case which most nearly is on point to this case is *The Matter of Adoption of J.S.R., supra,* decided by the District of Columbia Court of Appeals. In that case, foster parents sought the adoption of a minor child, who had been placed in their home by the District of Columbia Department of Public Welfare. The mother, at the time of the birth of the child, had been discovered to be suffering from multiple sclerosis and from that time was dependent on others for her needs. The mother withheld her consent to adoption and contended that the "best interest of the child" standard applied by the trial

court was unconstitutionally vague. The trial judge, while recognizing the interest of the natural parent and her right to primary consideration, found that the consent to the adoption was being withheld contrary to the child's best interest. The trial court characterized its choice as being the "least detrimental alternative." [2] The Court, in affirming the use of the "best interest" standard, said:

> We think it is plain that the standard "best interest of the child" requires the judge, recognizing human frailty and man's limitations with respect to forecasting the future course of human events, to make an informed and rational judgment, free of bias and favor, as to the least detrimental of the available alternatives. *In re Adoption of Tachick,* 60 Wis.2d 540, 210 N.W.2d 865 (1973). 374 A. 2d at 863.

In disposing of the constitutional argument in *J.S.R., supra* (similar to that urged in this case), the Court said:

> The right of a natural parent to raise one's child is a fundamental and essential one which is constitutionally protected. *Stanley v. Illinois, supra.* However, it is not an absolute one. The state has both the right and the duty to protect minor children through judicial determinations of their interest. To this end, the state has a substantial range of authority to protect the welfare of a child, *Prince v. Massachusetts, supra,* and the state's legitimate interest in the child's welfare may be implemented by separating the child from the parent, . . . . 374 A. 2d at 863.

The constitutional issues raised by appellant were considered by the Court of Appeals in *Winter v. Director of the Department of Public Welfare of Baltimore City,* 217 Md. 391, 143 A. 2d 81, *cert. denied,* 358 U. S. 912, 79 S. Ct. 242 (1958). In that case, the Court of Appeals had before it an attack on the constitutionality of Article 16, Sections 72 and

---

**2.** *See* J. Goldstein, A. Freud, and A. J. Solnit, Beyond the Best Interest of the Child (1973).

74. Section 74 provided in part that the court might grant a petition for adoption without parental consent "if after a hearing the court finds that such consent or consents are withheld contrary to the best interests of the child." The Court said, in rejecting the constitutional attack:

> The state as *parens patriae* and the protector of its inhabitants has, under proper circumstances, the power to change the status of a minor without the consent of the parent. While the natural rights of parents should be carefully guarded, the welfare and best interests of the child are primary considerations in all adoption proceedings. The validity of legislation permitting an adoption without the parents' consent is based upon the fact that a parent has no inherent right of property in a child, and the right that a parent has to the custody and rearing of his children is not an absolute one, but one that may be forfeited by abandonment, unfitness of the parent, or where some exceptional circumstances render the parents' custody of the child detrimental to the best interests of the child. [Citations omitted] 217 Md. at 395-96.

The experts in child psychology and psychiatry overwhelmingly agree that a stable home environment, and the security and continuity which flow from that condition are absolutely essential to overcome the feelings of inadequacy and insecurity which are so obviously present in Lloyd's situation at the present time.[3]

---

3. Dr. Andrew Watson, psychiatrist and professor of law, has said that stability is "practically the principal element in raising children, especially pre-puberty ones," and that "a child can handle almost anything better than he can handle instability" [*Citing* Proceedings of Special Committee on Uniform Divorce and Marriage Act, National Conference of Commissioners on Uniform State Laws 98, 101 (Dec. 15-16, 1968)]. Furthermore, Dr. Watson maintains that "poor parental models are easier to adapt to than ever shifting ones." Similarly, Dr. Herbert Modlin of the Menninger Foundation stresses the importance of "constancy of mothering" and describes the characteristics of children in the various periods of preadolescent and preadult existence in which their needs vary somewhat, but there is always the requirement of continuity and a sense of family, satisfying a need to belong. [*Citing* Readings in Law and Psychiatry 319-22 (R. Allen, E. Ferster & J. Rubin eds. (1968). *See also* Plant, The Psychiatrist Views Children of Divorced Parents,

In the present case, it must be conceded that the mother is not making any claim for custody and seeks only to retain her visitation rights and to prevent the termination of her parental rights. We conclude, however, that the chancellor had before him substantial evidence from which he could conclude that the child's best interests required the stability and predictability that would accrue from granting the Kuhns' petition to adopt. Whatever the cause, the overwhelming testimony by the expert psychiatrists and psychologists was that any continued effort to enforce visitation rights for the mother would be extremely detrimental in the future development of the child. The evidence is clear that, so far as Lloyd is concerned, the Kuhns are his mother and father, and their children are his brothers and sisters. Given his own limitations at this stage of his development, he is unable to differentiate between foster parents and a natural parent. Whether that situation will change in the future is, of course, unable to be predicted. In any event, the chancellor correctly did not attempt to assess blame or fault for the failure of the natural mother's efforts to maintain her relationship with her child by effective and satisfactory visitation. If there was, in fact, a failure of the Department of Social Services of Baltimore City to exercise its responsibilities properly, the welfare of the child may not be sacrificed as punishment for that failure. We recognize the pain and sorrow the termination of the parent-child relationship will inflict on this unfortunate appellant. We believe she may, at least, hope that as the child grows that Lloyd, who knows that he has a biological mother, may at some time in the future desire to revitalize the relationship which is being terminated by the adoption decree in this case. Only time will tell.

---

10 Law & Contemp. Prob. 807, 812-14, 816 (1944).] Professor Homer Clark has expressed the cruciality of stability in the following manner:

> One of the things that the child's welfare certainly demands is stability and regularity. If he is continuously being transferred from one parent to the other by conflicting court decrees, he may be a great deal worse off than if left with one parent, even though as an original proposition some better provision could have been made for him. H. Clark, Law of Domestic Relation 326 (1968).

Applying the standards for review enunciated in *Davis v. Davis, supra,* we do not find the chancellor clearly erroneous in his factual findings. Rule 1086. We find no errors of law which require any further proceedings. Finally, viewing the ultimate conclusion of the chancellor as being founded upon sound legal principles and based upon factual findings that are not clearly erroneous, we find no abuse of the chancellor's discretion.

*Decree affirmed; costs to be paid by appellee, Department of Social Services.*